(14 Misc. Rep. 204.)

### In re DWYER.

(Supreme Court, Special Term, Kings County. May, 1894.)

LOTTERIES—HORSE RACE.

    A horse race, the winner of which is to receive a certain stake, to be made up from the entrance fees paid by the owners of the contesting horses, and an additional sum to be added by the manager of the race if the entrance fees are insufficient, is not a lottery.

Application by Philip Dwyer for a writ of habeas corpus.

John M. Bowers and Charles J. Patterson, for petitioner.
Howe & Hummel, opposed.

GAYNOR, J. The two recent decisions in civil cases cited on the argument scarcely apply. The defendant is accused of "contriving, proposing, and maintaining a lottery," a crime defined in section 325 of the Penal Code. The undisputed facts are as follows: The defendant is the president of the Brooklyn Jockey Club, an association formed under the laws of this state for the incorporation of associations for improving the breed of horses, and located in the city of Brooklyn, where its grounds are. Acting for the association, the defendant advertised and organized a horse race to be run on the association's grounds on May 15, 1894. The race was to be open to all thoroughbred horses three years old and upwards; but, in order to run, horses had to be entered on the association's books. An entry fee of $250 was charged, part of which was to be remitted in the case of horses withdrawn before the race. The race was to be for a stake of $25,000, of which $18,000 was to go to the winner, $5,000 to the second horse, and $2,000 to the third. This stake was to be made up by the association adding to the total of the entry moneys a sum sufficient for that purpose. This is what the complainant calls a lottery. There is no foundation for his contention. It is not a lottery, either in common speech, or within legal definition. A lottery depends on lot or chance, such as the casting of lots, the throwing of dice, or the turning of a wheel. In the scheme of this race, horse owners do not pay a sum to win a larger

sum by lot or chance, but in order to enter into the contest of skill, endurance, and speed, upon which the stake depends. With the matter as a debatable moral question, I have nothing to do. I cannot make laws. I am bound to administer the laws as I find them. The complainant is free to urge the moral considerations suggested in his behalf to churches and religious societies, or wherever he may get a hearing, with a view of elevating the moral tone of the public to his standard, out of which would come an equally improved legislature, to make the law as he seems to want it. There can be no question as to what a lottery is under the laws of this state. Our statutes concerning lotteries constitute from an early beginning a distinct line of legislation. The subject has a legal literature all its own. The first statute concerning lotteries was the colonial one of 1721. It prohibited under penalties all lotteries not licensed by the government. After the independence, namely, in 1783, a similar act, more stringent and penal, was passed. It forbade private lotteries, and gave the state a monopoly of the business. From that time down to the making of the state constitution of 1821 there were many bills introduced into the legislature, no less than 44 of which became acts, for the establishment and management of lotteries for the raising of public revenue. As these acts show, money was thus raised for opening and improving roads, for improving the navigation of the Hudson river, for orphan asylums, boards of health, and the like. Lotteries were favorite means of raising money for educational purposes, and the title "An act instituting a lottery for the promotion of literature" did not look strange then, though it does now. In 1814 a lottery act for that object was preceded by the preamble, "Whereas, well regulated seminaries of learning are of immense importance to every country, and tend, especially by the diffusion of science and the promotion of morals, to defend and perpetuate the liberties of a free people;" therefore, etc. Union College was endowed by means of a state lottery. This mixture of morals and lotteries, and the elevation of the one by means of the other, continued until the adoption of the constitution of 1821, which contained the provision that "no lottery shall hereafter be authorized in this state," and this prohibition has remained in our constitution through the subsequent revision and amendments of that instrument. The debate over it in the constitutional convention of 1821 is interesting and enlightening, and forms part and parcel of the legal literature of lotteries in this state. No one, after recurring to that discussion, can have any doubt about what was meant by the word "lotteries" in the prohibition. The entire debate was conducted with precise and scientific reference to lotteries as then conducted by the state, and prohibited by statute to private individuals. Even Chancellor Kent rather opposed the prohibition, on the ground that lotteries were the best means for the state to get money for revenue from purse-proud misers and spendthrifts. A proposition to add to the prohibition against lotteries another forbidding horse racing was voted down in the convention. No one there ever thought of a horse race

for a stake being a lottery, and no such suggestion seems ever to have been made until now. When the constitution of 1821 went into effect, ample penal laws against private lotteries were already in the statute books, as has been seen. The lottery laws constituted a distinct system, with its own distinct literature and terminology; and it is now the time to state that precisely the same was true of the penal statutes against racing horses for stakes, against betting on such races, and against betting and gaming generally. The first penal statute concerning horse races was passed in 1802. It declared, among other things, the racing of horses "for any bet or stake" a public nuisance, and prescribed penalties against any one taking part therein, or contributing to, or getting up the stakes. So complete was this statute that, like the first two penal lottery statutes, it served as a basis for all subsequent legislation on the subject, except the statute against pool selling, which was first adopted as late as 1877. Thus there existed two distinct lines of legislation on two distinct subjects,—two distinct systems of statutes, the one on lotteries and the other on betting and gaming,—no one ever suggesting that the statutes in the one system also created or covered the offenses created and covered by those of the other. That was left until now, but there is no foundation for it whatever. To continue the parallel, in the first general revision of the statutes of this state, namely, in the codification known as the Revised Laws of 1813, we find these two systems separately revised, and placed in separate chapters; and from thence they come, still preserving their separate identities, into the next statutory revision and codification, namely, the Revised Statutes of 1830, where they were placed in separate articles, the one under the heading "Of Raffling and Lotteries" and the other under that "Of Betting and Gaming"; and, to bring the parallel down to the present time, so they remained until the legislature in 1881 gathered together all of our penal laws into one scientific statute, called the "Penal Code," where we find the two subjects still distinctly separated in different chapters, the one headed "Lotteries" and the other "Gaming." Racing horses for stakes was made penal by the statute of 1802, as has been seen, and the same provision, coming from the beginning down the same line of distinct legislation, is now found in section 352 of the Penal Code, which in so many words makes "all racing or trial of speed between horses or other animals for any bet, stake, or reward" a misdemeanor. It indisputably covers the facts of this case, namely, the racing of horses for contributed stakes. But by chapter 479 of the Laws of 1887 the operation of this section is suspended during 30 days in each year on the grounds of the said association, and all like associations, and the day of the race on which the alleged offense is predicated was one of those days. The complainant, therefore, being unable to have the defendant arrested for any actual offense, but being apparently bent on having him arrested anyhow, called racing horses for a stake a lottery, and accused him, as has been seen, under section 325 of the Penal Code, which is found in the chapter on "Lotteries," and makes the contriving, proposing,

or maintaining of a lottery a crime. The legislature having specifically singled out racing for stakes, and made it a distinct crime, and prescribed a punishment for it, it cannot be called some other crime, and punished as such. Racing horses for stakes may be bad, but unlawful arrests are worse. The arrest and detention of the defendant was unwarranted. It was an exercise of arbitrary power, and history teaches that we have more to fear from arbitrary power than from all species of gambling combined. The prisoner is discharged.

Prisoner discharged.