Patrick McGovern et al., Appellants, *v.* The City of New York, Respondent.

Constitutional law — contract — municipal corporations — New York city — interpretation of prohibitions of Constitution — constitutional prohibition of grant of extra compensation by city to contractor — when agreement that city would pay increased cost of labor and materials to contractors in consideration of their settling strike by paying increased wages demanded by workmen invalid — no surrender of right where it was their duty to continue work — when strike due to failure of contractor to pay wages essential to keep work going not one resulting in necessary delay — when abandonment by strikers of scale of wages established for term of contract of no importance — act of contractors in yielding to strikers no consideration for promise to pay claims — general statement that promise was made, sufficient on demurrer — when failure to vote required bonds matter of defense.

1. When dealing with a restraint imposed by the Constitution itself upon the agencies of government, its prohibitions are to be interpreted, not narrowly and grudgingly like those of a penal statute, but broadly and liberally to promote the policy behind them. A payment to a contractor does not cease to be extra compensation because some fragment of consideration, sufficient, it may be, to sustain a contract between private parties, may give to the transaction the aspect of an exchange of values.

2. A contract made by the public service commission and the board of estimate and apportionment of the city of New York whereby they expressly, jointly and severally, promised and agreed that if plaintiffs would settle a strike by paying increased wages to workmen employed by them in the performance of a subway contract, previously entered into with the city of New York, the city would pay the increased cost of labor and material due to the war from April 6, 1917, as well as any future increase due to the same cause, is condemned by section 28 of article 3 of the State Constitution and a demurrer to the complaint in an action for the breach thereof will be sustained where it clearly appears from the complaint that the wages demanded by the workmen were not unreasonable and that other workmen could not be obtained unless at increased wages. (*Gordon* v. *State of New York*, 233 N. Y. 1, followed; *United States* v. *Cook*, 257 U. S. 523, distinguished.)

3. A contention that plaintiffs are not seeking a gift in form or substance but the stipulated equivalent for the surrender of a right cannot be upheld. They had covenanted to build the road and to keep at all times upon the work a suitable supply of men. This meant that they must hire the labor and pay the wages necessary to permit them to proceed. Their duty was to avert the strike unless there was a reasonable prospect that without unreasonable delay other labor could be obtained at cheaper rates, not less, however, than those prevailing in the market. They, therefore, did nothing more than it was their duty to do without additional reward.

4. A clause in the contract extending the time for completion in case the contractor shall be actually and necessarily delayed by reason of any labor strike not instituted or provoked by the contractor or his agents, does not help the plaintiffs. A strike due to the failure of the contractor to pay wages essential to keep the work going, if those wages are reasonable in amount, and if cheaper labor cannot be obtained at the prevailing market rates, is not one resulting in necessary delay, but on the contrary is caused or provoked by the contractor itself.

5. Nor is the fact that the strikers abandoned a scale of wages which had been established to hold good until the construction contracts were completed of importance, where the contracts of employment were terminable at will, and, in any event, plaintiffs may not set up their own contract with their own employees as an excuse for the non-fulfillment of their duty to defendant.

6. Nor did the act of plaintiffs in yielding to the strikers and going forward with the work supply a consideration for an alleged promise to pay certain claims of plaintiffs against defendant for delays already suffered as a result of defendant's acts, where it appears that the

delays occurred while the undertaking was still new and that the plaintiffs with notice of the breach had elected to perform. Long before the promise of extra compensation, the right to rescind, if it ever existed, had been definitely renounced   What was left was a claim for the damages incurred, and these damages the plaintiffs may still recover.

7. Nor is the promise authorized or ratified by chapter 586 of the Laws of 1918 giving, or assuming to give, to the city the privilege, at its election, to cancel existing contracts and remake them on new terms, or by chapter 911 of the Laws of 1921, conferring a right of action upon contractors who have fulfilled their contracts in reliance upon a promise to pay the increased cost resulting from a state of war.   If the first statute can be sustained, the city did not attempt to comply with its provisions, and if the promise is invalid under the Constitution the second cannot make it valid.

8. Separate causes of action alleging that " for a good and valuable consideration given, paid and parted with by the plaintiffs to the defendant," there was a promise to pay the increased cost of labor and material resulting from the war must be upheld.   A general statement that a promise was made for value is sufficient on demurrer and for the purpose of demurrer each count must stand alone.

9. Failure to vote bonds to an adequate amount to provide for payment of the extra compensation as required by the Rapid Transit Act (L. 1909, ch. 498), if failure there was, is matter of defense.

*McGovern* v. *City of New York,* 202 App. Div. 317, modified.

(Argued November 22, 1922; decided January 9, 1923.)

Appeal, by permission, from an order of the Appellate Division of the Supreme Court in the first judicial department, entered July 24, 1922, which reversed an order of Special Term overruling defendant's demurrer to the fourth, fifth and sixth causes of action set forth in the complaint and sustained said demurrers.

The following questions were certified:

" I. Do the allegations of the fourth cause of action in the complaint herein state facts sufficient to constitute a cause of action?

" II. Do the allegations of the fifth cause of action in the complaint herein state facts sufficient to constitute a cause of action?

" III. Do the allegations of the sixth cause of action

in the complaint herein state facts sufficient to constitute a cause of action? "

*Thomas F. Conway, Joseph A. Kellogg* and *Thomas E. O'Brien* for appellants. The facts stated in the fourth cause of action are sufficient to entitle plaintiffs to recover the damages claimed thereunder, irrespective of the validity of chapter 711 of the Laws of 1921. (*McMaster* v. *State,* 108 N. Y. 542; Williston on Cont. 239; *International Ry. Co.* v. *Rann,* 224 N. Y. 83; *Hamer* v. *Sidway,* 124 N. Y. 538; *Marie* v. *Garrison,* 83 N. Y. 14; *United Steel Co.* v. *Casey,* 262 Fed. Rep. 889; *Meech* v. *City of Buffalo,* 29 N. Y. 198; *Atlantic City* v. *Warren Bros. Co.,* 226 Fed. Rep. 372; *County of Randolph* v. *Post,* 93 U. S. 502; *Lattimore* v. *Harsen,* 14 Johns. 330.) Defendant's power, acting by the commission and the board of estimate, to modify the original agreement, as set forth in the complaint, is not open to question. (*McNulty* v. *City of New York,* 168 N. Y. 117; *Brady* v. *Mayor, etc.,* 1 Barb. 584; *Messenger* v. *City of Buffalo,* 21 N. Y. 196; *Harlem Gas Co.* v. *Mayor, etc., of N. Y.,* 33 N. Y. 309; *Peterson* v. *Mayor, etc., of N. Y.,* 17 N. Y. 449; *City of Newport News* v. *Potter,* 122 Fed. Rep. 321; *Peake* v. *New Orleans,* 139 U. S. 342; *Meriwether* v. *Garrett,* 102 U. S. 472; L. 1918, ch. 506; *People ex rel. Durham Realty Corp.* v. *La Fetra,* 230 N. Y. 429; *Guttag* v. *Shatzkin,* 230 N. Y. 647; *Matter of McAneny,* 232 N. Y. 377.) The modifying agreements in no way offend any provision of the Constitution of the state. (*United States* v. *Cook,* 257 U. S. 523 [Feb. 1922].) Chapter 711 of the Laws of 1921 is a valid legislative enactment. (*Hanrahan* v. *T. S. Com.,* 206 N. Y. 494; *McGrath* v. *Grout,* 171 N. Y. 7; *Matter of Application of Church,* 92 N. Y. 1; *People ex rel. Electric Lines Co.* v. *Squire,* 107 N. Y. 593; 145 U. S. 175; *People* v. *Dunn,* 157 N. Y. 528; *Admiral Realty Co.* v. *City of New York,* 206 N. Y. 110; *Gubner* v. *McClellan,* 130 App. Div. 716; *Kittinger* v. *Buffalo Traction Co.,* 160 N. Y. 377; *Matter*

*of McAneny,* 198 App. Div. 205; 232 N. Y. 377; *Matter of N. Y. El. R. R. Co.,* 70 N. Y. 327.)

*Alfred C. Petté, Asa B. Kellogg, Franklin Nevins* and *Edward M. Grout* for General Contractors Association et al., *amicus curiæ.* Chapter 711 of the Laws of 1921 is constitutional and valid. (*D., L. & W. R. R. Co.* v. *Bowns,* 58 N. Y. 573; *Holbrook, Cabot & Rollins Corp.* v. *City of New York,* 277 Fed. Rep. 840; *Matter of McAneny* v. *Board of Estimate,* 232 N. Y. 377; *People ex rel. Durham Realty Corp.* v. *La Fetra,* 230 N. Y. 429; *People ex rel. Wells & Newton Co.* v. *Craig,* 232 N. Y. 125; *Wrought Iron Bridge Co.* v. *Town of Attica,* 119 N. Y. 204; *Gaynor* v. *Village of Portchester,* 230 N. Y. 210; *Matter of Greene,* 166 N. Y. 485.)

*John P. O'Brien,* Corporation Counsel (*Clarence J. Shearn* of counsel), for respondent. There was no consideration for the alleged promise to pay for the work contracted for a sum over and above the contract price. Accordingly, the contract pleaded falls within the condemnation of section 28 of article 3, prohibiting the grant of any extra compensation to any contractor. (*Matter of Mahon* v. *Board of Education,* 171 N. Y. 263; *People ex rel. Wells & Newton Co.* v. *Craig,* 232 N. Y. 125; *Gordon* v. *State of New York,* 233 N. Y. 1; *People ex rel. Dady* v. *Prendergast,* 144 App. Div. 308; 203 N. Y. 1; *Stemmler* v. *Mayor, etc.,* 179 N. Y. 473; *De Cicco* v. *Schweizer,* 221 N. Y. 431; *Leahy* v. *Lucius Engineering Co.,* 186 App. Div. 354.) Chapter 711 of the Laws of 1921 is invalid because it is in contravention of article 3, section 28, of the Constitution of the state of New York. (*Gordon* v. *State,* 233 N. Y. 1; *Stemmler* v. *Mayor, etc.,* 173 N. Y. 473.)

Cardozo, J. The plaintiffs made a contract with the defendant, the city of New York, in August, 1916, for the construction of that part of the subway known as

route number 61 in consideration of the payment of $4,194,797. They assert the existence of a later contract by which the defendant, acting through the public service commission and the board of estimate and apportionment, undertook to pay to them the extra cost incurred through the advance in the price of labor and material as a consequence of the war. The validity of that contract is the chief question to be determined. The circumstances leading up to its making are set forth fully in the fourth cause of action, to which for the time being our attention will be confined. The fifth and sixth causes of action, which together with the fourth are challenged by the demurrer, involve narrower questions of pleading with but slight relation to the merits.

The plaintiffs say that at the commencement of the work, the General Contractors' Association, of which they are members, fixed a wage scale with representatives of the labor unions engaged in subway work which was to continue unchanged until the completion of the contracts. In December, 1916, the men demanded an increase. The contractors yielded to the demand under protest, and fixed a new scale to continue for a stated time. In February, 1917, before the stated time had elapsed, there was a new demand. The workmen appealed to the commission and its chairman. The commission insisted that the work must not be interrupted. The contractors, however, were assured that a way would be found of reimbursing them for the increased expense. They were also assured that in the judgment of the commission a state of war was then imminent between the United States and Germany, that war would probably lead to still greater cost both of labor and of materials, and that if war were declared, " the defendant would pay plaintiffs and said other contractors, respectively, all further increases in the cost of labor and materials that might be due to it, or to labor inefficiency resulting from or following it." There was also a promise to co-operate

with the contractors in procuring the legislation necessary to that end. Shortly thereafter war was declared, and the contractors thereupon established a new scale to take effect from April 1, 1917, and to continue until the completion of the contracts. The war withdrew from peaceful industry great numbers of workmen whose services were required by the government. It also transferred large numbers to the munition plants and to other industries engaged in the manufacture of war materials and the furnishing of war supplies. The government at places outside of New York paid a scale of wages greatly in excess of that prevailing in subway and similar work when war was declared. So also did the war industries. " As a result of said increased demand for the services of workmen and of men for military duty by the United States and other employers, and the greatly increased wages established, offered and paid as aforesaid elsewhere than in New York city and its vicinity, as well as the increased and increasing cost of living," the workmen, in May, 1918, despite their earlier agreements, demanded " a large increase in the wages they were then being paid and in excess of the then prevailing rate," and gave notice to the contractors and to the commission and the board of estimate that they would strike if said increase was not granted. The contractors refused to pay said increase unless " defendant would agree to reimburse them for the added cost to them resulting from payment of said increased scale as compared with the scale prevailing at the date of their respective contracts, and also the increase in the cost of material due to the war, as compared with its cost at said dates, on the further performance and completion of their respective contracts," besides the increased cost of both labor and material paid or incurred since April 6, 1917. They did not limit their demand to the prospective increase in the cost of labor, but they included prospective increase in the cost of material, and also past increases in the cost both of labor and of material.

The commission and the board of estimate and apportionment, thus pressed, promised to enter into a binding agreement accordingly, and if necessary to exercise the powers conferred by the so-called Lockwood Act (L. 1918, ch. 586). The plaintiffs in reliance on these assurances accepted the new scale, and put it in force for one week beginning June 1, 1918. The defendant, however, failed and refused to enter into any binding agreement, and thereupon the plaintiffs canceled the new scale, and the men struck. They gave notice in striking that, unless they had a satisfactory agreement, they would scatter and prevent the further prosecution of subway work. Thereupon the board of estimate and the commission held joint and separate meetings. As a result, according to the allegations of the complaint, they " expressly, jointly and severally promised and agreed " that if the contractors would pay the increased wages, the defendant would pay the increased cost of labor and material " due to the war " from April 6, 1917, as well as any future increase " due to the same cause." The amount of the increase in the cost of labor was to be ascertained by comparing the scale of wages established in April, 1917, with the rates in force when the construction contracts were made, and the amount of the increase in the cost of material was to be computed in a like way. For breach of that agreement this action is brought. There are allegations that a critical situation was presented by the threatened strike; that there was danger of great injury to the public by the obstruction of the work; that about 6,000 workmen were employed; and that in the emergency thus arising it was necessary to relieve the contractors from burdens not foreseen when the undertaking was begun.

We think the contract is condemned by article III, section 28, of the Constitution of the state.

" The legislature shall not, nor shall the common council of any city, nor any board of supervisors, grant any extra compensation to any public officer, servant,

agent or contractor" (Constitution, art. III, § 28). We have held that there is no power to repair out of the public purse the losses that war prices have brought to contractors with state or municipality in the performance of their contracts (*Gordon* v. *State of N. Y.*, 233 N. Y. 1). Nothing inconsistent with our ruling was held in *U. S.* v. *Cook* (257 U. S. 523) which sustained an act of Congress awarding extra compensation to contractors with the United States who had suffered from the San Francisco earthquake. Extra compensation in circumstances of hardship may be consistent, where the supporting equity is strong enough, with the due process clause of the federal Constitution (*People* v. *Westchester County Nat. Bank*, 231 N. Y. 465, 470). It is not consistent with a provision in the Constitution of the state whereby the power to give extra compensation is explicitly withheld.

The contractors say that what they are seeking is not a gift in form or substance, not an extra at all in the sense of a gratuitous concession, but the stipulated equivalent for the surrender of a right. The right, when subjected to analysis, will be found to be illusory. Millions were promised by the city in return for an unreal surrender. Either there was no consideration at all, or the shred of value, if any, is so grossly disproportionate to the return that to uphold it as sufficient would be to nullify the Constitution by subterfuge and fiction.

We are told that a right was surrendered when the contractors paid the wages that were necessary to keep the work in motion, and avert its disruption and suspension as the result of a protracted strike. In the circumstances disclosed by the complaint they could not have done less without being guilty of a wrong. They had covenanted to build the road and to keep at all times upon the work a suitable supply of men. This meant that they must hire the labor and pay the wages necessary to permit them to proceed. Their duty was to avert the strike

unless there was a reasonable prospect that without unreasonable delay other labor could be obtained at cheaper rates, not less, however, than those prevailing in the market. Payment of less is forbidden by the statute (Labor Law, § 3; Consol. Laws, ch. 31). The complaint does not justify the inference that other labor could have been procured, or that the plaintiffs had any thought or expectation of procuring it. The contrary is alleged by implication, if not expressly. We are told that the workmen's cost of living had gone up to an extent entirely out of proportion to the wages they were receiving. We are told that other industries and occupations offered more attractive returns, and that the workmen threatened to go into these industries, and scatter, and put an end to the subway work. We are told all this without suggestion that the menace was exaggerated, or that the strikers' places could be filled. We are told again and again that the extra cost of labor was " due to the war," and the very contract sued upon is for the payment of the increase of cost, and the " necessary " increase, " due to the war," and to nothing else. In these circumstances, it does not help the plaintiffs to point to statements here and there in the complaint that the wages demanded by the men were " in excess of the prevailing rates in subway and similar work." This is merely to say again in other words that the strikers were asking for more than they had been getting in the past. We are to determine the character of the transaction, not from isolated sentences, but from its origin and purpose as revealed in the pleading as a whole. The statement that war increased the cost of labor can only mean that war increased the prevailing or market rates at which labor could be obtained. The plaintiffs will not be heard to say for the purpose of establishing a consideration that rates remained unchanged, and for the purpose of establishing a breach that rates were swollen by the war. Their counsel, if we read his argument aright, has not meant to involve

his clients in such a contradiction.  It is significant that he appends to his brief a copy of a proposed contract between the contractors and the city which embodies this recital: " Whereas the contractor states and represents that unless the demand of the workmen is met immediately, said workmen will cease working for it and obtain employment at wages higher than the contractor is able to pay and that owing to the conditions arising out of the war it is impossible to obtain workmen unless at increased wages." We find it incredible, indeed, that the municipal authorities would have been willing in any other circumstances to subject the municipality to so enormous an increase of expense.  If the complaint is read in its entirety, the conclusion is inevitable that the workmen asked for wages not unreasonable in amount, that owing to the war labor could not be obtained at lower rates, and that neither a strike nor any reasonable opportunity to look for labor elsewhere would have changed the situation.

The plaintiffs, therefore, did nothing more than it was their duty to do without additional reward (*DeCicco* v. *Schweizer*, 221 N. Y. 431, 435; *Schwartzreich* v. *Bauman-Basch, Inc.*, 231 N. Y. 196, 204).  Their case is built on the mistaken notion that a strike in and of itself was sufficient to relieve them of a duty to proceed.  The contractors, it is said in the complaint, " were under no duty or obligation to terminate or prevent said strike, or *any* strike or threatened strike, as their respective contracts contained provisions in substance to the effect that in case of strikes their respective times to complete and perform their contracts would be extended for a period of time equalling the time or times any such strike or strikes might or should continue or exist, and without penalty."  The contract is referred to in the complaint as incorporated therein, and a copy was handed up to us on the argument.  The plaintiffs misconceive its effect.  After declaring that time is of the essence, and

providing for liquidated damages for delay, it extends the time for completion in case the contractor shall be actually and necessarily delayed by reason of any labor strike not caused or instituted or provoked by the contractor or his agents. A strike due to the failure of the contractor to pay the wages essential to keep the work going, if those wages are reasonable in amount, and if cheaper labor cannot be obtained at the prevailing market rates, is not one resulting in necessary delay, but on the contrary is caused or provoked by the contractor itself. The contract does not mean that whenever a strike is threatened, the contractor may abandon all effort to avert it, and fold his hands until such time as lower wages may prevail. The plaintiffs stress the fact that the strikers abandoned a scale of wages which had been established to hold good till the construction contracts were completed. The contracts of employment, however, were terminable at will. The men did not agree to serve till the completion of the work, nor the plaintiffs to employ them till that time. The severance of the relation did not constitute a wrong. But the wrong, if it were proved, would not enlarge the plaintiffs' rights. They may not set up their own contract with their own employees as an excuse for the non-fulfillment of their duty to another (*People* v. *N. Y. C. & H. R. R. R. Co.*, 28 Hun, 543, 558; *Blackstock* v. *N. Y. & E. R. R. Co.*, 20 N. Y. 48, 51). In such a situation, nothing of value was given up by the contractors when they gave up the opportunity to involve the city in a strike. They made no claim to the city, they make no claim to the court, that they expected, if these men left, to find others to fill the places. Their position was that they had reached the limit of their own readiness to proceed with the performance of a losing contract. " Nothing is consideration," it has been held, " that is not regarded as such by both parties " (*Philpot* v. *Gruninger*, 14 Wall. 570, 577; *Fire Ins. Assn.* v. *Wickham*, 141 U. S. 564, 579; *DeCicco*

v. *Schweizer, supra,* at p. 438). The fortuitous presence in a transaction of some possibility of detriment, latent but unthought of, is not enough (*Fire Ins. Assn.* v. *Wickham, supra*). Promisor and promisee must have dealt with it as the inducement to the promise (Holmes Common Law, p. 292; *Wisconsin & Mich. Ry. Co.* v. *Powers,* 191 U. S. 379, 386; 1 Williston, Contracts, § 139, p. 309). The proposition to modify the contract was not presented by the plaintiffs, nor accepted by the city, as one for the surrender of a veritable opportunity to find cheaper labor elsewhere. It was presented and accepted on the theory that the opportunity did not exist either in expectation or in reality. The plaintiffs did not take the attitude that they could carry the work on at a lower cost, and that to benefit the city they would assume an extra burden. The plaintiffs took the attitude that they proposed to stand aside, and that since the work could not be done more cheaply, it would not be done at all.

Some point is made that the contractors had claims against the defendant for delays already suffered as a result of the defendant's acts, and that there was a promise to pay these claims if the contractors would yield to the strikers and go forward with the work. The act did not supply a consideration for the promise. The delays charged against the city occurred while the undertaking was still new. The contractors with notice of the breach had elected to perform. Long before the promise of extra compensation, the right to rescind, if it ever existed, had been definitively renounced. What was left was a claim for the damages incurred (*Mawhinney* v. *Millbrook Woolen Mills,* 234 N. Y. 244; *Deeves & Son* v. *Manhattan Life Ins. Co.,* 195 N. Y. 324). The contractors did not suggest that they had anything else. They did not refuse to put an end to the strike on the ground that some default on the part of the defendant permitted them to declare the contract at an end. No such right was asserted, and no

compromise of such a claim of right was intended by the new agreement. Whatever damages have been suffered as a result of the defendant's fault, the plaintiffs may still recover. These damages are the subject of the third cause of action, which is not brought up by this demurrer. The basis of the recovery, if there is to be any, must be default with attendant liability. Assumption of liability will not serve if the assumption is in exchange for the fulfilment of a duty.

We hold, then, that the defendant's promise is unenforcible for lack of a consideration to support it. If, however, some shred of value could be discovered, if we could gather from the maze of this complaint the abandonment of an opportunity to find cheaper labor elsewhere, the promise in its dominant purpose and effect would remain the promise of a gift. We are dealing here with a restraint imposed by the Constitution itself upon the agencies of government. Its prohibitions are to be interpreted, not narrowly and grudgingly like those of a penal statute (*McCulloch* v. *Maryland*, 4 Wheat. 316; *Prigg* v. *Penn.*, 16 Pet. 539, 612), but broadly and liberally to promote the policy behind them. A payment to a contractor does not cease to be extra compensation because some fragment of consideration, sufficient, it may be, to sustain a contract between private parties, may give to the transaction the aspect of an exchange of values. The underlying realities of plan and purpose and effect must prevail over the form or the disguise which may incumber or belie them. Approached in this spirit, the argument for the plaintiffs is seen to be beside the point. The argument is that courts do not weigh the adequacy of the consideration in determining whether an agreement has the obligation of a contract. Enough that a right has been renounced. The renunciation supports the concession of anything, no matter how large, that is offered in return. That may be true if the existence of a contract is the only question to be determined. What concerns

us here is not whether a contract exists, but whether in substance and operation it is one for extra compensation, a largess in purpose and effect though in name and in form a payment for money's worth (cf. *Matter of Orvis*, 223 N. Y. 1, 8). The Constitution would be " a splendid bauble " (MARSHALL, Ch. J., in *McCulloch* v. *Maryland*, *supra*, at p. 421) if its mandate could be evaded by the surrender of any right however trivial or technical. In such matters, tendencies and consequences count for more than forms and names.

This contract in its dominant purpose and effect was one to repair the hardships of the war by the award to the contractors of extra compensation. Its genesis and its provisions permit no other inference. The project was conceived as soon as war was imminent. The certainty of soaring prices was foreseen, and relief by legislation was planned in forgetfulness of the restraints to which legislation itself is subject. The project started as one for a largess or gratuity, and what it was at the beginning it continued to the end. Neither the plaintiffs nor the defendant had any thought that there was even a semblance of equality in the value of their reciprocal concessions. The plaintiffs did not limit themselves to a request for the payment of the larger wages then exacted by the workmen. They insisted that they receive whatever increase of wages might become necessary thereafter. They were not satisfied with that. They required the payment by the city of the increased cost of material as well as labor, and that not merely in the future, but retrospectively, from the beginning of the war. More than half the items of expenditure set forth in the complaint are classed under that head. The defendant on its side conceded everything that was asked, in effect indemnifying its contractors against loss through the fluctuations of the market, while continuing to be bound for the payment of the contract price with any profit there included. All this was done though the

plaintiffs surrendered nothing, unless it be the opportunity, known to be unsubstantial, and never mentioned, so far as appears, in the course of the negotiations, of finding cheaper labor elsewhere without descending below the level fixed by labor law and market. We cheat ourselves with words and forms when we speak of this surrender as the dominant inducement moving the defendant to the assumption of its added burdens. Here was no genuine balancing of values, no estimate of *quid pro quo* as even approximate equivalents, no thought that the contractors were contributing anything, much less a return for payments mounting into millions, nothing but an effort to spur them by a bounty to the fulfilment of their duty. We are not to " shut our minds " as judges to truths that " all others can see and understand " (Taft, Ch. J., in *Bailey* v. *Drexel Furniture Co.* [*Child Labor Tax Case*], 259 U. S. 20).

Statutes are relied upon by the plaintiffs as authorizing or ratifying the defendant's promise. They need not long detain us. One (L. 1918, ch. 586) gave, or assumed to give, to the city the privilege at its election to cancel existing contracts, and remake them on new terms. The terms differ in essentials from those of the agreement sued on. Contractors taking advantage of the act must complete at cost without profit. The plaintiffs bargained for cost and the profit besides. If this act could be sustained, which we do not decide, the city did not attempt to comply with its provisions. Another statute (L. 1921, ch. 911) confers a right of action upon contractors who have fulfilled their contracts in reliance upon a promise to pay the increased cost resulting from a state of war. If the promise is invalid under the Constitution as one for extra compensation (Constitution, art. III, § 28), the statute cannot make it valid (*Gordon* v. *State, supra*).

The fifth and sixth causes of action remain to be considered. They allege, with slight differences of form,

that " for a good and valuable consideration given, paid and parted with by the plaintiffs to the defendant," there was a promise to pay the increased cost of labor and material resulting from the war.   Unlike the fourth cause of action, they do not tell us what the consideration was. We have held that a general statement that a promise was made for value is sufficient on demurrer (*California Pack-ing Co.* v. *Kelly S. & D. Co.,* 228 N. Y. 49).   The com-mission and the city might have made the contract in the beginning on the basis of cost plus a designated profit. They might modify the contract afterwards by putting payments on that basis, if the value given in return was not a subterfuge or cover for extra compensation.   That it was this we are not at liberty to presume in the absence of a statement of its nature.   The plaintiffs will fail upon the trial if the transaction stated in the fifth and sixth counts of the complaint shall turn out to be the same as the one described in the fourth, and founded on no better value.   For the purpose of demurrer, each count must stand alone (*Crehan* v. *Megargel,* 234 N. Y. 67.)

We do not overlook the defendant's argument that under the Rapid Transit Act (L. 1909, ch. 498) the contract changing the rate of compensation was illegal unless bonds to an adequate amount had previously been authorized, and that in the absence of an appropriate allegation to that effect the complaint in all its counts must be adjudged defective.   We think the failure to vote the bonds, if failure there was, is matter of defense (*McNulty* v. *City of New York,* 168 N. Y. 117).   A public officer who makes or lets a contract must be pre-sumed to have complied with the necessary preliminaries (*Bank of U. S.* v. *Dandridge,* 12 Wheat. 79).

The order should be affirmed, without costs, in so far as it sustains the demurrer to the fourth cause of action, and reversed, without costs, in so far as it sustains the demurrer to the fifth and sixth, with leave to the plaintiffs to amend within twenty days after service of a copy of

the order to be entered on our remittitur, and with leave to the defendant to withdraw its demurrer, and answer the complaint, within a like time. The first question certified is answered in the negative and the second and third questions are answered in the affirmative.

Hiscock, Ch. J., Hogan, Pound, McLaughlin, Crane and Andrews, JJ., concur.

Ordered accordingly.