Argued October 1, reversed December 19, 1962, petition for
rehearing denied January 23, 1963

# CUDD ET AL *v.* ASCHENBRENNER
377 P. 2d 150

*Gene L. Brown,* Grants Pass, argued the cause for appellants. With him on the brief was R. Gene Smith, Grants Pass.

*L. A. Aschenbrenner,* Grants Pass, argued the cause for respondent. With him on the brief was William H. Ferguson, Grants Pass.

*Harold W. Adams,* Assistant Attorney General, Salem, argued the cause on behalf of the Attorney

General as amicus curiae. With him on the brief was Robert Y. Thornton, Attorney General of Oregon, Salem.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, SLOAN, O'CONNELL, GOODWIN and LUSK, Justices.

ROSSMAN, J.

This is an appeal by the plaintiffs from a decree entered by the circuit court in a declaratory judgment proceeding which held that a promotion scheme conducted by the plaintiffs for the purpose of attracting customers to two grocery stores was a lottery under the provisions of ORS 167.405 and Article XV, Oregon Constitution. The defendant is Mr. L. A. Aschenbrenner, district attorney for Josephine County.

The promotion scheme or program which is in essence a weekly "lucky draw," is known as "Strike it Rich." Anyone desiring to do so may enter one of the stores using the plaintiffs' scheme and register. He is under no obligation to make a purchase. The registrant writes his name, address and telephone number on a paper provided therefor and is given a number. From this information store employees prepare a "registration card," one part of which is used in the actual drawing. Also at the time of registration, the participant is given a coupon upon which he signs his name. It has numbers from 1 to 52 around the edge. In order to be eligible for the cash award a participant must have his coupon "validated" each week by having one of the numbers punched out. Coupons may be validated at the store at any time and without obligation, except that coupons are not validated on Wednesday, the day on which the drawing

is held. The drawing takes place once each week on the parking lot adjoining the store. If the person whose number is drawn is present he receives a cash award of at least $100. If he is not present at that time, the amount of the award for the following week is increased by $100. The jackpot is allowed to increase until the prize reaches $500.

The parties have stipulated that many of those who register are customers of the store and make purchases at the time of registration. Likewise, many persons make purchases at the time they have their coupons validated. But purchases are not a prerequisite to registration or the validation of the coupons.

■■ Article XV Section 4 of the Oregon Constitution provides:

> "Lotteries, and the sale of lottery tickets, for any purpose whatsoever, are prohibited and the legislative assembly shall prevent the same by penal laws."

Pursuant to that constitutional mandate, the legislature enacted ORS 167.405 which says, in part:

> "(1) Any person who promotes or sets up any lottery for money or any other valuable thing, or disposes of any property of value, by way or means of lottery, or aids or is in any way concerned in setting up, managing, or drawing such lottery, or who in any house, shop, boat, shed or building owned or occupied by him or under his control, knowingly permits the setting up, management, or drawing of any lottery, or the sale of any lottery tickets, share of a ticket, or any writing, token, or other device purporting or intended to entitle the holder or bearer thereof, or any other person, to any prize or interest or share thereof, to be drawn in any lottery, shall be punished upon conviction * * *."

Clearly lotteries are illegal in Oregon. But legislatures generally, ours among them, have been reluctant to define the term "lottery." This reluctance may be due "to the fact that a precise definition will enable ingenious and unscrupulous persons to devise some plan which may not be within the letter of the definition given but which nevertheless is within the scope of the mischief which the law seeks to remedy." *State v. Bussiere*, 155 Me 331, 154 A2d 702 (1959).

> "* * * So varied have been the techniques used by promoters to conceal the joint factors of prize, chance and consideration, and so clever have they been in applying these techniques to feigned as well as legitimate business activities, that it has often been difficult to apply the decision of one case to the facts of another." *FCC v. American Broadcasting Company*, 347 US 284, 98 L Ed 699, 74 S Ct 593 (1953).

In our state the courts have been left to decide what schemes are lotteries on a case-by-case basis.

■ The determination of what constitutes a lottery is no easy matter. *State v. Schwemler*, 154 Or 533, 60 P2d 938 (1936), defined a lottery as "any scheme whereby one, on paying money or other valuable thing to another, becomes entitled to receive from him such a return in value, or nothing, as some formula of chance may determine." Accordingly, this court has accepted the almost universal formula that the three elements of prize, chance and consideration are essential to a lottery. It follows that the absence of any one of these elements removes the scheme from that category. *Multnomah County Fair Association v. Langley*, 140 Or 172, 13 P2d 354 (1932).

■ Although it has been relatively easy for the courts to decide whether the elements of "prize" and

"chance" are present in a given instance, a very real problem has arisen as to what constitutes "consideration" for purposes of the anti-lottery statutes. In some jurisdictions the principles which apply to ordinary contracts have been rigidly adhered to. Such courts have found mere participation in the scheme by patrons of the business as constituting consideration. They have deemed it inconsequential that the participants were required to pay nothing of value for the chance to participate. See, for example, *Lucky Calendar Co. v. Cohen,* 19 NJ 399, 117 A2d 487 (1955); *Maughs v. Porter,* 157 Va 417, 161 SE 242 (1931). Other courts hold that the anti-lottery laws contemplate that a consideration of some economic value passes from the participant before a gift enterprise may be deemed a lottery. Examples of the latter are *State v. Bussiere,* supra; *California Gasoline and Retailers v. Regal Corporation of Fresno, Inc.,* 50 Cal 2d 844, 330 P2d 778 (1958); *State ex rel Stafford v. Theatre Corporation,* 114 Mont 52, 132 P2d 689 (1942); *People v. Mail and Express Co.,* 179 NYS 640, affd 231 NY 586 (1919).

In determining which contrivances are lotteries it is the duty of the court to ascertain, where possible, what the authors of the constitutional and statutory anti-lottery provisions deemed to be a lottery. ORS 174.020. In arriving at the legislative intention many factors must be considered such as the language used, the object to be accomplished and the history behind the provision—no one of which is completely controlling. *Fox v. Galloway,* 174 Or 339, 146 P2d 922 (1944). Thus it was said in *State v. Schwemler,* 154 Or 533, 60 P2d 938 (1936), that:

"It is settled that the word 'lottery,' as used in the constitution of this state, has no technical,

legal signification different from the popular one and the word is to be given the meaning generally accepted and in popular use at the time when the constitution was adopted * * *."

Lotteries, which had their beginnings in antiquity, came to America from Europe. American colonists used this method extensively for the raising of funds for the carrying on of governmental functions. In some instances licenses to operate lotteries were granted to private lottery companies, which conducted the lottery as a business for their own profit. Perhaps the most famous of these was the powerful Louisiana Lottery. Its promoters made enormous profits at the expense of its participants. Their great wealth gave them a powerful influence on the politics of the state. Opponents of the lottery found it increasingly difficult to combat this influence. But gradually the serious financial drain caused by this and other lotteries, the high incidence of fraud in conducting them, and economic depressions led to public agitation against them. State after state passed laws prohibiting them until they were in disrepute. See, generally, Organized Crime and Law Enforcement, ABA Commission on Organized Crime (1952); Thomas, Lotteries, Frauds and Obscenity in the Mails, Chapter I, page 1; Williams, Lotteries, Laws and Morals, Chapter II, page 28.

It is important to our consideration that the goal of these schemes, which were popularly known as "lotteries," was the raising of money directly from contributions made by the participants. These contributions were almost invariably cash, and were always a prerequisite to participation in the scheme. The Encyclopedia Britannica, Volume 10, in its sec-

tion on "Gaming and Wagering," describes the popular concept of the mechanics of a "lottery" as follows:

"* * * Tickets bearing different numbers are placed on sale, and a date is set for a drawing. On that date is set up a device which contains numbered duplicates of all the tickets sold, and one or more numbers are drawn at random. From the money realized by the sale of tickets, the proprietors of the lottery deduct some amount, arbitrarily determined, for expenses and profits; the remainder is paid to the holders of tickets corresponding to those drawn."

There were many variations of this procedure. But essential to all of them was the contribution by the participants of money or something which was of economic value to them, as a condition of participation.

■ It is not possible to obtain a true concept of what those who framed our constitution and statute conceived to be a lottery without considering the evil at which they directed the prohibition. The Encyclopedia Britannica, supra, describes that evil as follows:

"The principal charge against lotteries is that they penalize the poor, who in ill-advised hope or desperation buy most of the tickets; Count Camillo Benso Cavour called lottery 'a tax on imbeciles * * *.' "

In 1808 the British Government appointed a Select Committee to inquire into the evils of lotteries and the effect of the laws which had been instituted to regulate them. We quote the following discussion of its report from Williams, Flexible Participation Lotteries (1938), Chap. II, page 5:

"In the report of this committee, many instances were adduced of the most serious evils arising from lotteries. These included cases where people living in comfort and respectability had been reduced

by their speculations to 'the most abject state of poverty and distress'; cases of domestic quarrels, assaults, and the ruin of family peace; fathers deserting their families and falling into want and disgrace; mothers neglecting their children, sometimes leaving them destitute; wives robbing their husbands of the earnings of months and years; and the pawning of clothing, beds and wedding rings in order to indulge in speculation. 'In other cases children had robbed their parents, servants their masters; suicides had been committed, and almost every crime that can be imagined had been occasioned, either directly or indirectly, through the baneful influence of lotteries.' "

It is abundantly clear from this description of the evils attending "lotteries," as that term was commonly understood, that they were the result of speculation. Their operation depended upon the wagering by the participants of money or something of monetary value on the chance that they would win something of far greater value. Thus, the Supreme Court of Maine, in *State v. Bussiere,* supra, said:

"We cannot go along, under the facts of this case, with those jurisdictions which hold that consideration is not an element of lottery, or with those jurisdictions which hold that consideration is necessary, but may consist of anything which is a detriment to a participant or a benefit to the promoter. We feel that the plan of the defendant lacks one element which is the source of all evil connected with lotteries or gambling; that of a person risking or hazarding something of value, however small, with the hope or opportunity of obtaining a larger sum by chance."

■ In *State v. Cox,* 136 Mont 507, 349 P2d 104 (1960), the court said:

"To our mind, the framers of the Montana Constitution * * * were seeking to suppress and

restrain the spirit of gambling which is cultivated
and stimulated by schemes whereby one is induced
to hazard his earnings with the hope of large win-
nings. The statutes which define and prohibit lot-
teries must therefore be interpreted with this pur-
pose in mind * * *."

In this statement we concur. To attempt to interpret
the anti-lottery laws without considering the circum-
stances which spawned them would eviscerate the
legislative mandate that the Court is to seek the legis-
lature's intent. The attorney general's brief informs
us that the New York Code had a substantial influence
on the framers of our constitution and on our legis-
lators. We quote from a discussion of the history of
the New York anti-lottery statutes in the case of *In re
Dwyer,* 14 Misc Rep 204, 35 NYS 884 (1894), as
follows:

"* * * There can be no question as to what a
lottery is under the laws of this state. Our statutes
concerning lotteries constitute from an early be-
ginning a distinct line of legislation. The subject
has a legal literature all its own. * * * The debate
over it in the constitutional convention of 1821 is
interesting and enlightening, and forms part and
parcel of the legal literature of lotteries in this
state. No one, after recurring to that discussion,
can have any doubt about what was meant by the
word 'lotteries' in the prohibition. The entire de-
bate was conducted with precise and scientific
reference to lotteries as then conducted by the
state, and prohibited by the statute to private indi-
viduals. * * *"

We have discussed those and similar lotteries and
their evil effects. We have shown that the anti-lottery
statutes were enacted to prevent the impoverishment
of the individual and its attendant evils. Unless a
scheme requires that (1) a participant part with a

consideration, and (2) the consideration be something of economic value to him, participation therein can rob him neither of his purse nor his accumulated worldly goods. We must conclude, therefore, that the anti-lottery provisions of our statute are directed at schemes in which participants are obligated to contribute something which is of economic value to them as a condition of participation. We do no violence to the law of contracts when we hold that a lottery contemplates a greater consideration than is generally required to support a contract. Professor Corbin, in 1 Corbin on Contracts, Sec. 109, page 346, discusses the problem of defining "consideration," and comes to the following conclusion:

"* * * Who can now read all the reports of cases dealing with the law of consideration * * * laying down the doctrines and constructing the definitions? Certainly not the writer of this volume. He has merely read enough of them to feel well assured that the reasons for enforcing informal promises are many, that the doctrine of consideration is many doctrines, that no definition can rightly be set up as the one and only correct definition, and that the law of contract is an evolutionary product that has changed with time * * *."

We merely hold that a lottery is a special kind of contract which requires a special kind of consideration—consideration which can impoverish the individual who parts with it.

The holdings of this court since the enactment of the anti-lottery provisions of our statute are consistent with this view. *Quatsoe v. Eggleston,* 42 Or 315, 71 P 66 (1903), defined a lottery as "a gambling contract in which one or more parties on the one side risk a small sum for the chance of obtaining a greater, the

winner or winners to be determined by lot * * *," and as "any scheme whereby one, on paying money or valuable thing to another, becomes entitled to receive from him such a return in value, or nothing, as some formula of chance may determine." This definition was approved in *National Thrift Association v. Crews,* 116 Or 352, 241 P 72 (1925), and in *State v. Schwemler,* supra. In *United States v. Olney, 1 Abbott,* 275 (1868), Judge Deady, a participant in the convention which framed the constitution of this state, spoke as follows in defining the word "lottery."

> " 'A distribution of prizes and blanks by chance; a game of hazard, in which small sums are ventured for the chance of obtaining a larger value either in money or other articles.'—Worcester's Dic."

> " 'A sort of gaming contract, by which, for a valuable consideration, one may by favor of the lot obtain a prize of a value superior to the amount or value of that which he risks.'—American Cyclopoedia."

*McFadden v. Bain,* 162 Or 250, 91 P2d 292 (1939), said:

> "It is, of course, lawful, if not resorted to as a device to evade the law, for a person to give away his money or property by lot or chance. The vice is in the payment of a consideration for the chance * * *."

It will be noted that the language throughout has reference to "payment," a "small sum," or "money," or "other valuable thing." In each scheme which this court has declared to be a lottery, it has been careful to find a monetary consideration. That it has done this warrants our holding in the present case that a consideration of some economic value must be exacted of the participant if the scheme under scrutiny is to be deemed a lottery.

We are aware of the substantial number of cases in various jurisdictions which have held to the contrary. The fallacy in their position lies in the mechanical application of preconceived notions of "prize, chance and consideration," without attempting to look behind those words in order to discover what concepts their users intended to convey. Those words were not written in a vacuum. We prefer not to interpret them in one.

■ The defendant urges that even if it be conceded that a lottery requires a consideration of economic value to the participant, such consideration is present in the case at bar because some of the participants bought groceries while they were registering for the draw. The contention is based upon the assumption that a part of the price paid for the groceries was paid as consideration for the chance to compete for the prize. He claims that it is immaterial that some of the participants bought no groceries, and that no participant was in any way obligated to buy. He concludes that consideration paid by one person taints the whole scheme and thus casts it into the category of a lottery.

In *Philpot v. Gruninger,* 14 Wall. 570, 20 L Ed 743 (US 1871), the United States Supreme Court said:

"* * * Nothing is consideration that is not regarded as such by both parties. It is the price voluntarily paid for a promisor's undertaking. * * *"

We quote the following from the opinion of Mr. Justice Holmes in the case of *Wisconsin & Michigan Railway Co. v. Powers,* 191 US 379, 48 L Ed 229 (1903):

"In the case at bar, of course the building and operating of the railroad was a sufficient detriment

or change of position to constitute a consideration if the other elements were present. But the other elements are that the promise and the detriment are the conventional inducements each for the other. No matter what the actual motive may have been, by the express or implied terms of the contract, the promise and the consideration must purport to be the motive each for the other, in whole or at least in part. * * *"

And Mr. Justice Cardozo, in *McGovern v. City of New York,* 234 NY 377 (1923), expressed the same sentiment in the following words:

"* * * 'Nothing is consideration,' it has been held, 'that is not regarded as such by both parties' * * * The fortuitous presence in a transaction of some possibility of detriment, latent but unthought of, is not enough * * * Promisor and promisee must have dealt with it as the inducement to the promise (Holmes Common Law, p. 292 * * * 1 Williston, Contracts, Sec. 139, p. 309). * * *"

See also Corbin on Contracts, Sec. 118, p. 364; Williston on Contracts, Sec. 100, p. 369, 3rd ed. Section 120, p. 369, Corbin on Contracts, follows:

"If the term 'consideration' is restricted to a 'bargained-for equivalent given in exchange for the promise,' it is clear that the parties must agree upon what it is. It is one of the elements of the agreement that must be mutually assented to in order that there may be a contract. If one party offers to sell his car for a thousand dollars and the other party says that he accepts at the price of nine hundred dollars, there is no contract. The reason that there is none is that the parties have expressed no agreement as to the consideration for the promise to sell the car. Therefore, in making such a bargain, the consideration must always be expressed in some intelligible way. It need not be called by the name of 'consideration,' or by any other specific name; but it must be agreed upon

and the agreement must be evidenced in some way that will satisfy the court."

It is clear from the foregoing that consideration must be something which the parties have agreed shall be such. It therefore becomes important to discover exactly what the agreement between the parties to the promotional device before us entailed. Eligibility for the prizes depended upon the fulfillment of three prerequisites relevant to the issues before us. First, the participant had to appear at the store in person for the initial registration. Second, he had to appear at the store to have his coupon validated each week in which he wished to be eligible for a prize. Third, he had to be personally present on the parking lot of the store at the time of the drawing. To each participant who met these three requirements, the owner of the store promised a chance at the prize. Those were the elements of the bargain. It is clear that there is sufficient consideration in the fulfillment of these conditions to support an ordinary contract. But we have shown that a greater consideration is necessary to constitute the scheme a lottery. The defendant's argument that those who purchase commodities at the store are paying a valuable consideration overlooks the fact that neither the storeowners nor the participants considered the making of a purchase a prerequisite to participation. The making of a purchase was neither expressly nor by implication a part of the bargain. And in the words of Justice Cardozo, quoted above, "The fortuitous presence in the transaction of some possibility of detriment, latent but unthought of, is not enough." Viewing the facts of this case in light of the analysis which has gone before, we must conclude that there was no consideration which passed from the participant to the owner

of the store sufficient to constitute the scheme before us a lottery.

*McFadden v. Bain,* supra, upon hasty reading, may appear to subscribe to a view contrary to the one taken above. But in that case, as the decision reveals, those who entered the theatre and, as a part of the paying audience participated in the drawing, had actually purchased tickets. The decision held that the price which they paid for the theatre tickets included something for their participation in the drawing. By buying a ticket and getting inside the theatre they could watch the drawing. It is true that those who had been given free tickets that enabled them to participate in the drawing even though they remained outside could possibly win the prize, but the decision held that that fact was immaterial since those who were inside the theatre had paid not only for their theatre tickets but also for participation in the drawing. As to them the scheme was held to be a lottery. They had actually parted with consideration in the form of money. In *McFadden v. Bain,* supra, the situation was as described in the language which we now quote from it:

"'* * * So here the test is not whether it was possible to win without paying for admission to the theatre. The test is whether that group who did pay for admission were paying in part for the chance of a prize.'"

That fact must be borne in mind in assaying the decision. Thus, in *McFadden v. Bain* bank night was held a lottery because those who were in the theatre had parted with money that paid not only for their admission but also for participation in the drawing. Those who remained outside had received their tickets free when distribution was made in the neighborhood.

No one of them could enter the theatre unless the number which had been given to him free was declared the lucky number. If it was the lucky number, the holder had to enter the theatre in the presence of those who had purchased tickets, walk upon the stage and receive the prize. Some cases take note of the fact that a person usually feels a strong compulsion to buy a ticket rather than walk through a crowd and face the embarrassment of being thought a freeloader or cheap skate by those who have purchased tickets. Possibly only very small boys, who have paid nothing, feel like heroes when they win a prize in the midst of those who have purchased tickets. We do not embrace the compulsion rule and have no need to do so; but it is pertinent to take note of the fact that this case does not fall even within its scope.

In the case now at bar every participant is like those in *McFadden v. Bain* who remained outside the theatre. None had purchased a ticket or anything else. In fact, the participants in this case were even more favorably situated than those in *McFadden v. Bain,* for since everyone was upon an equal footing none could feel embarrassment if his number was called and he walked to the platform to receive his prize. Whether he purchased anything or not in the store was a matter for his individual choice. There was no compulsion upon him. Unlike the situation in *McFadden v. Bain* where the drawing took place in a theatre, the plaintiffs' drawing took place outside the plaintiffs' store. In fact, it occurred in an open parking lot. The lucky individual who received the prize could put it in his pocket, go home and spend not a penny in the plaintiffs' stores.

Very likely the money that constitutes the prize comes from the sale of groceries; but for present pur-

poses that is immaterial. The crucial inquiry is: did the participant part with any consideration. The chances are that whatever money the store spends for attracting to itself customers comes from the money that the latter spend in the store. The material fact is that no participant in the drawing under analysis can become impoverished by going to the drawing. It costs him nothing and he parts with nothing.

Defendant implies in his brief that this method of advertising is unfair to plaintiffs' competitors. He also intimates that the congested traffic in the vicinity of the plaintiffs' stores on the night of the drawing causes problems for the police force and is a nuisance. While these contentions may have merit, these questions are not before us to decide. We are to determine whether the plaintiffs may be held criminally liable under our anti-lottery statute for conducting the scheme which we have considered. We hold that they may not for the reason that the scheme is not a lottery under the laws of this state.

We state once more that no one could be rendered poor by participating in the plaintiffs' drawings. The worst that could happen to anyone would be that he would buy some groceries. But, if he purchased any, he would not do so in order to qualify himself as a participant in the drawing—for participation was free—but voluntarily. His purchase would not enhance in the slightest degree his chances upon the drawings. Participation in the drawings could not become for him a gambling tendency. There was nothing that anyone could do that would improve his prospects of winning. If anyone parted with any money while upon the plaintiffs' premises, he did so solely in the purchase of merchandise. If he purchased anything, he did so at the same price as others who

did not participate in the drawings, and their purchase had no effect upon his chances of winning. In order to participate in the drawings it was not necessary for anyone to spend a nickel in the store or in any other place. Tickets for the drawings and tickets to the parking lot (where the drawing occurred) were not for sale. They were free. Anyone who wished to do so could enter the parking lot and watch, free of charge, the drawings take place. This promotional scheme is a mere means of drawing customers to the plaintiffs' stores. The latter possibly devote some of their advertising budget to the creation of the prizes. The scheme is not a lottery although the prize money is distributed by chance. It is not a lottery because there is no consideration which is in any way harmful to the participant. The participant parts with nothing of any value to himself.

The decree of the circuit court is reversed.

O'CONNELL, J., specially concurring.

I concur in the result reached by the majority. I do not agree with that part of the opinion which purports to distinguish the present case from *McFadden v. Bain,* 162 Or 250, 91 P2d 292 (1939). *McFadden v. Bain* was incorrectly decided and should be overruled.

I agree with the majority in holding that a lottery does not exist unless the device employed tends to produce the type of evil which the constitution was intended to obviate. Those evils are not present in the operation of the advertising scheme adopted by the plaintiff in this case.

McALLISTER, C. J., dissenting.

The holding in *McFadden v. Bain,* 162 Or 250, 91 P2d 292 (1939), is directly contrary to the holding of the majority in the case at bar. The parties have

stipulated that many of those who qualify for the drawings are customers of the store and purchase groceries, both when they register and again when they return each week to have their tickets validated. The consideration for this lottery is paid by those who purchase groceries, just as in *McFadden* the consideration for the lottery was paid by those who purchased theatre tickets. In the case at bar, as in *McFadden,* opportunity was given to some to participate in the drawings without buying anything, either groceries, or theatre tickets.

In *McFadden,* at 255 of 162 Or, this court said:

"To constitute a lottery, it is not necessary for all participants to pay for their chances, but it is sufficient if some do though many do not pay a valuable consideration. The legal effect of the transaction is not changed by the fact that some do not pay. If it is a lottery as to those who do pay, it necessarily is a lottery as to those who do not pay for their chances.

"As was said in *Commonwealth v. Wall,* supra [3 NE2d 28], '* * * a game does not cease to be a lottery because some, or even many, of the players are admitted to play free, so long as others continue to pay for their chances. (Citing authorities.) So here the test is not whether it was possible to win without paying for admission to the theatre. The test is whether that group who did pay for admission were paying in part for the chance of a prize.'

"See also *Glover v. Malloska,* 238 Mich. 216, 219, 213 N. W. 107, 52 A. L. R. 77, where the above was quoted with approval."

In my opinion *McFadden v. Bain,* supra, was properly decided and controls the disposition of the case at bar. I dissent.

Sloan, J. concurs in this dissent.