Hubert KEPHART et al., Plaintiffs,

v.

Dee WILSON et al., Defendants.

Civ. No. 2438.

United States District Court
W. D. Texas,
El Paso Division.

July 19, 1963.

John D. Conner, Washington, D. C., and Maurice R. Bullock, Fort Stockton, Tex., for plaintiffs.

Howard Rooney, Washington, D. C., Atty., Dept. of Agriculture, Ernest Morgan, U. S. Dist. Atty., and Frederick J. Morton, Asst. U. S. Dist. Atty., for defendants.

GRAVEN, Senior District Judge (assigned).

In this proceeding the plaintiffs have brought to this Court for review a determination made by a Review Committee acting under the provisions of the Agricultural Adjustment Act of 1938, as amended. The determination of the Review Committee had to do with the transfer to Culberson County, Texas, of cotton allotments which had pertained to certain tracts in Custer County, Oklahoma, which had been taken by the United States under eminent domain. In this proceeding the plaintiffs have also brought before the Court certain other matters and issues which will be discussed later.

Cotton allotment programs have been in effect since 1954 under Farm Referendums held under the provisions of Section 1343, Title 7, U.S.C.A. Under those programs the Secretary of Agriculture determines the national cotton acreage allotment; that allotment is apportioned among the states; the allotment of each state is apportioned among its counties; and the county allotments are then apportioned among the cotton producing farms in the respective counties. Section 1344(a, b, e, f), Title 7, U.S.C.A.

The administrative organization which has been provided for the administration of the cotton allotment programs and other farm programs is now known as the Agricultural Stabilization and Conservation Service, commonly referred to as ASCS. Under the administrative organization certain farm program matters are handled at the state level by a State ASCS Committee and at the county level by a County ASCS Committee. The members of the State ASCS Committee are appointed by the Secretary of Agriculture. The members of the County Committee are three in number and are elected by the producers in each county acting through county conventions.

In connection with the administration of the cotton allotment programs, the County Committees have had to do with the allotment of cotton acreage allotments to the cotton producing farms in their re-

spective counties and the increasing or decreasing of those allotments. Section 1363, Title 7, U.S.C.A., provides, in substance, that any producer who is dissatisfied with the action taken in connection with his allotment may have such action reviewed by a Review Committee consisting of three farmers from the same or nearby counties appointed by the Secretary of Agriculture. Section 1365, Title 7, U.S.C.A., provides, in part:

"If the farmer is dissatisfied with the determination of the review committee, he may, within fifteen days after a notice of such determination is mailed to him by registered mail or by certified mail, file a bill in equity against the review committee as defendant in the United States district court * * * for the purpose of obtaining a review of such determination. * * *"

That Section further provides that upon being served with notice of the review the Review Committee shall file in the reviewing court a transcript of the record upon which the determination complained of was made together with its findings of fact.

It has been an integral part of the cotton allotment programs that, save where specifically authorized by law, a cotton allotment may not be sold or transferred except in connection with the sale or transfer of the farm to which it pertains. During World War II the United States condemned large tracts of land for military installations and since World War II the United States has condemned numerous tracts for military and other purposes. Many of the tracts condemned contained farms which had crop allotments. To deal with those situations the Congress in 1958 enacted what now appears as Section 1378, Title 7, U.S.C.A. That Section provides, in part:

"(a) Notwithstanding any other provision of this chapter, the allotment determined for any commodity for any land from which the owner is displaced because of acquisition of the land for any purpose * * * by any Federal, State, or other

agency having the right of eminent domain shall be placed in an allotment pool and shall be available only for use in providing allotments for other farms owned by the owner so displaced. Upon application to the county committee, within three years after the date of such displacement, * * * any owner so displaced shall be entitled to have established for other farms owned by him allotments which are comparable with allotments determined for other farms in the same area * * *."

Section 1388, Title 7, U.S.C.A., is a part of a chapter which relates to cotton allotment programs. It provides, in part:

"(a) The provisions of sections 590h(b) and 590k of Title 16, relating to the utilization of State, county, local committees, * * * shall apply in the administration of this chapter; * * *."

Section 590h(b) of Title 16 referred to provides for the organization of state, county and local committees. That Section further provides, in part:

"* * * The Secretary [of Agriculture] shall make such regulations as are necessary relating to the selection and exercise of the functions of the respective committees, and to the administration, through such committees, of such programs. * * *"

The Secretary of Agriculture has promulgated extensive regulations relating to cotton allotment programs. They presently appear in 7 C.F.R. as Section 722.1 through Section 722.582 and are 178 pages in length.

Reference has heretofore been made to Section 1378, Title 7, U.S.C.A., under which cotton producers whose farms had been taken by eminent domain could secure transfer of the allotments pertaining to those farms to other farms acquired by them for the purpose of reestablishing their farming operations. Following the enactment of that statute, the Secretary of Agriculture implement-

ed that statute from time to time by regulations. 7 C.F.R. 719.12. Under those regulations the application for the transfer of an allotment under the provisions of Section 1378 is to be made to the County ASCS Committee of the county in which the displaced owner proposed to reestablish his farming operations. That Committee is referred to as the receiving County Committee.

Starting in 1958 and ending in 1960 the United States condemned numerous tracts of land in Custer County, Oklahoma. Included among the tracts condemned were sixteen farms owned by fifteen owners. One of the displaced owners, J. R. Kenney, was the owner of two of the farms condemned. The applicants for this review consist of those fifteen owners, Fred Chandler, Sr., Fred Chandler, Jr., and the Chandler Company. The displaced owners are Cecil E. Brown, A. H. Crawford, A. N. Easley, Vernon Fletcher, Woodrow Gum, J. R. Kenney, Jack H. Kenney, Lewis E. Kenney, Paul Kenney, Walter S. Kenney, Hubert Kephart, Vernon McLaughlin, L. M. Stout, Jack V. Warner, and Vance Kenney. The transactions which are the subject matter of this proceeding were had between the fifteen owners and Fred Chandler, Sr., Fred Chandler, Jr., and the Chandler Company, a co-partnership composed of Fred Chandler, Sr., and Fred Chandler, Jr. They are residents of Texas. A Texas corporation, Capitan Company, which will be hereinafter referred to, was a family corporation of the Chandlers. For convenience, Fred Chandler, Sr., Fred Chandler, Jr., and the Chandler Company will be frequently referred to as the Chandlers. The defendants herein appeared throughout in these proceedings by an attorney for the Department of Agriculture, by the United States District Attorney for this District, and a member of his staff. It is clear that the resistance to the granting of the relief sought by the fifteen farmers and the Chandlers is being made by the Department of Agriculture. For convenience in reference, the contentions and claims made in behalf of the defendants herein will be referred to as being made by the Government.

A preliminary statement setting forth facts which are not in dispute will next be made. By a deed dated June 27, 1960, the Capitan Company acquired from Paul C. Teas, Jr., of Midland County, Texas, and his sister, Laura Sutherland, also referred to as L. S. Sutherland, of Dallas County, Texas, a tract of land in Culberson County, Texas, containing approximately 3,000 acres. That tract included all of Sections 3 and 9 in the area described. The total purchase price was $450,000, of which $10,000 was paid in cash. The balance of the purchase price was evidenced by promissory notes. One note was for $10,000 payable September 1, 1960. Another note was for $15,000 payable December 1, 1960. Another note was for $415,000 payable in twenty annual installments due on December 1 of each year, the first installment of which was due on December 1, 1961, and the last installment of which was due on December 1, 1980. The notes bore interest at the rate of five and one-half per cent (5½%) per annum. The unpaid purchase price was secured by a deed of trust to the land conveyed. The conveyance was subject to the oil, gas and other mineral rights reserved to the State of Texas in the patents to the lands included in the tract.

By deed dated January 19, 1961, Fred Chandler, Sr., and Fred Chandler, Jr., acquired from Paul C. Teas of Dallas County, Texas, a tract of land in Culberson County, Texas, described as Survey No. 40, block 64, township 7. It is referred to in the record as being land in Section 40. The total purchase price was $22,274 of which $5,000 was paid in cash. The balance of the purchase price was evidenced by a note dated January 19, 1961, for $17,274 payable in ten equal annual installments. The note was secured by a deed of trust to the land conveyed. The deed of conveyance conveyed the surface of the land together with an undivided one-half participatory oil and

gas royalty interest. The deeds to the tracts and the mortgages were recorded.

In November, 1960, the Chandlers entered into an unrecorded agreement with Paul C. Teas, Jr., and Laura Sutherland under which the note for $415,000 was surrendered and replaced by two notes, one for $35,000 and one for $380,000. The note for $35,000 was intended to reflect the unpaid purchase price of the land located in Section 9 and in the east part of Section 3. Under the agreement upon the payment of $35,000 that part of the land would be released from the lien of the mortgage. Under the agreement the Chandlers were privileged to pay the full amount on December 1, 1961. Later the agreement was modified so as to permit the Chandlers to pay one-half of the $35,000 on December 1, 1961, and the balance on December 1, 1962, if they wished to do so. Some of the land purchased from Paul C. Teas, Jr., and Laura Sutherland was improved land which had certain cotton allotments, but a substantial portion of it was unimproved land which had no cotton allotments.

In the spring of 1960 Fred Chandler, Sr., learned that a number of farm owners owning land in Custer County, Oklahoma, had had their farms taken by the United States by eminent domain. He thereupon became interested in the possibility of having the cotton allotments of those farms transferred to Texas. In the summer of 1960 he went to Clinton, Custer County, Oklahoma, with the objective of working out arrangements under which the cotton allotments of the displaced farmers could be withdrawn from the Custer County cotton allotment pool and transferred to Culberson County, Texas. At Clinton he contacted Harry White, the Performance Supervisor in the Custer County ASCS Office, and Russell Dill, the County Office Manager in the same office. Prior to coming to Clinton Fred Chandler, Sr., had talked to Harry White over the telephone. Fred Chandler, Sr., made arrangements with Harry White and Russell Dill to render services for him for compensation. Fred Chandler, Sr., had oral negotiations with the fifteen displaced owners in regard to the matter of the transfer of their cotton allotments to Culberson County, Texas. Between January 25, 1961, and February 11, 1961, sixteen deeds were executed in favor of the fifteen displaced farm owners. The deeds described portions of the tracts in Culberson County, Texas, which had been earlier purchased from Paul C. Teas, Jr., and Laura Sutherland. The grantees of those deeds then executed leases for the tracts described in the deeds in which Fred Chandler, Sr., was the lessee. The leases were all similar in form. They provided that the land described therein was leased for a lump sum to the lessee for a term of twenty years. The leases contained the following provisions:

"Lessee shall pay to Lessor as cash rent for the entire term of this lease the sum of [amount different in each lease], and Lessee shall pay all taxes during the term of this lease.

"It is further agreed by the parties hereto that upon the execution of this lease and contract, Lessee herein shall take possession of the land and premises herein described and shall farm the same during the period of this lease in a good and farmer-like manner and shall maintain all improvements thereon in a good state of repair, reasonable wear and tear excepted and upon the termination of said lease, shall surrender the property to Lessor.

\* \* \* \* \* \*

"It is further agreed and understood that Lessee herein shall have the right and may assign this lease without the consent of Lessor but that Lessee will remain liable to Lessor as hereinbefore set forth."

The only written evidence as to the transactions between Fred Chandler, Sr., and the displaced owners was contained in the leases and in the deeds. The deeds were warranty deeds and, save as to the grantor or grantors, the land described,

and the amounts to be paid by the grantee, contained identical provisions. The deed to Woodrow Gum is typical. That deed, in part, was as follows:

"FRED CHANDLER, SR., ET AL
TO
WOODROW GUM
} WARRANTY DEED

THE STATE OF TEXAS
COUNTY OF CULBERSON
} KNOW ALL MEN BY THESE
PRESENTS:

That Fred Chandler, Sr., and Fred Chandler, Jr., of Fort Stockton, Pecos County, Texas, for and in consideration of the sum of Ten Dollars ($10.00) to us in hand paid by Woodrow Gum of Custer County, Oklahoma, the receipt of which is hereby acknowledged and confessed and in further consideration the said Woodrow Gum does hereby agree and does assume the payment of an indebtedness against the hereinafter described land and premises in the amount of ONE THOUSAND FIVE HUNDRED SEVENTY-FIVE DOLLARS ($1575.00) which said sum represents the purchase price of said land by the Grantors herein from Paul Teas, Jr., of Midland County, Texas, and the further sum of Nine Hundred Dollars ($900.00) being the cost of clearing said land, has granted, sold and conveyed and by these presents does grant, sell and convey unto the said Woodrow Gum of the County of Custer, State of Oklahoma, all that certain tract, lot or parcel of land described as follows, TO-WIT:

[Description of forty-five acres]

* * * *."

The assumed indebtedness recited in each deed was equal to $35 an acre and the clearing cost recited was $20 an acre. In each case the acreage of the tract described in the deed contained sufficient land to support the transfer of the cotton allotment each of the displaced owners had in the county cotton allotment pool. The ratio was approximately three acres for each cotton allotment transferred.

It was orally agreed between the displaced owners and Fred Chandler, Sr., if he drilled wells on any of the tracts conveyed the owner would sell him the one acre of land on which the well was located for $75.

The displaced owners made applications for the transfer of their cotton allotments to the lands in Culberson County, Texas, described in the deeds referred to. On February 17, 1961, eight of the displaced owners appeared before the Culberson County ASCS Committee in support of their applications. Four of them appeared before that Committee on May 22, 1961, in support of their applications. J. R. Kenney appeared before that Committee on both February 17, 1961, and May 22, 1961. Three of them did not appear before that Committee but filed affidavits in support of their applications. The Culberson County Committee approved all of the applications. Commencing on February 17, 1961, and ending on July 13, 1961, the Texas State ASCS Office approved the actions of the Culberson County Committee in connection with the transfers. In 1961 the Chandler Company, a co-partnership composed of Fred Chandler, Sr., and Fred Chandler, Jr., planted and raised cotton on the tracts purchased from Paul C. Teas, Jr., and Laura Sutherland to the extent of the cotton allotments at-

tached to those tracts at the time of purchase and to the extent of the cotton allotments transferred from Oklahoma. During the 1961 crop year each of the tracts to which the Oklahoma allotments had been transferred bore its own cotton allotment ASCS number. In March, 1962, the Chandler Company had all of the tracts with cotton allotments reconstituted under one ASCS number.

During the summer of 1961 the Department of Agriculture started an investigation as to the transfers of cotton allotments here involved as well as to other cotton allotment transfers. Upon direction of the Department of Agriculture, the Culberson County Committee requested the Chandler Company to furnish information as to the transfers on forms entitled "Seller's Certification of Bona Fide Sale of Land" as to the transfers here involved. Those certifications were completed by the Chandler Company and returned to the Culberson County Committee on February 27, 1962. Investigative activity on the part of the Department of Agriculture as to the transfers continued. On April 26, 1962, the Culberson County Committee held a meeting. A portion of the minutes of that meeting is next set forth:

"UNITED STATES DEPARTMENT OF AGRICULTURE

Agricultural Stabilization and Conservation

Extract of the minutes of the County ASC Committee for Culberson County, Texas held at Van Horn, Texas on the 26th day of April 1962.

1. Revised Farm Allotment Notices: At the direction of the Administrator ASCS, revised farm allotment notices are being furnished the following farm operators and owners for the reason that investigation has disclosed irregularities in certification that no side agreements exists relating to the sale and lease back of the land involved. It has been concluded that failure to furnish all documents and side agreements (oral or written) was a misrepresentation of the facts when coupled with the applicants certification on Form CSS–178 that there were no side agreements for the purpose of obtaining an allotment for a person other than the applicant:

| Farm No. | Farm Operator | Farm Owner | Revised 1961 Allotment |
|---|---|---|---|
| 127 | Chandler Company | J. R. Kenney | .0 |
| 128 | Chandler Company | Vernon McLaughlin | .0 |
| 129 | Chandler Company | Woodrow Gum | .0 |
| 130 | Chandler Company | A. N. Easley | .0 |
| 131 | Chandler Company | L. M. Stout | .0 |
| 132 | Chandler Company | Cecil E. Brown | .0 |
| 133 | Chandler Company | Jack D. Warner | .0 |
| 134 | Chandler Company | Vernon Fletcher | .0 |
| 135 | Chandler Company | A. H. Crawford | .0 |
| 136 | Chandler Company | Hubert Kephart | .0 |
| 138 | Chandler Company | Lewis Kenney | .0 |
| 139 | Chandler Company | Jack Kenney | .0 |
| 140 | Chandler Company | J. R. Kenney | .0 |
| 141 | Chandler Company | Walter S. Kenney | .0 |
| 142 | Chandler Company | Paul Kenney | .0 |
| 143 | Chandler Company | Vance Kenney | .0 " |

On April 27, 1962, the Culberson County Committee executed and issued formal notices reducing the allotments in question to zero. Timely appeals were then taken to the Review Committee as to those notices. Later the Culberson County Committee issued notices of penalties in excess of $58,000 because of the cotton produced on and marketed from the tracts in question by the Chandlers during 1961. Timely appeals to the Review Committee were also taken as to those notices.

The reduction of the cotton allotments of the disputed tracts to zero by the Culberson County Committee left those tracts without cotton allotments for the 1962 cotton crop year. The Chandlers nevertheless produced cotton on those tracts in 1962. Penalty notices were issued to the Chandlers because of such production. While the appeals to the Review Committee as to the reduction of the cotton allotments to zero and the amount of penalties as to the 1961 crop were pending, but before they had been heard and determined, the plaintiffs on August 22, 1962, commenced an action in this Court designated as Civil No. 2438. In that action the jurisdictional allegations were as follows:

"1. The jurisdiction of this Court is invoked under the general equity powers of the Court, U.S.C. Title 28, Sections 1331 and 1337; the Declaratory Judgments Act, U.S.C. Title 28, Sections 2201 and 2202; and the Administrative Procedure Act, U.S.C. Title 5, Sections 1001, et seq. This action arises under Article V of the Amendments to the Constitution of the United States; the Agricultural Adjustment Act of 1938, as amended, U.S.C. Title 7, Sections 1281, et seq., and regulations promulgated by the Secretary of Agriculture pursuant thereto (7 C.F.R., Ch. VII); and the Agricultural Act of 1949, U.S.C. Title 7, Sections 1421, et seq., and regulations promulgated by the Secretary of Agriculture pursuant thereto (6 C.F.R., Ch. IV)."

The defendants to that action were the members of the Culberson County Committee, the State ASCS Director, and the members of the State ASCS Committee.

In their complaint the plaintiffs alleged that the Culberson County Committee, in reducing the cotton allotments to the disputed tracts to zero and in issuing the penalty notices in connection with the 1961 crop, had acted improperly. They alleged that the Culberson County Committee had also improperly refused to issue cotton allotments for the disputed tracts for 1962 and that penalty notices had been issued by that Committee for the 1962 crop on those tracts. The plaintiffs asked that the defendants be enjoined from taking any action to collect the penalties for the 1961 crop on the disputed tracts. They also asked that the defendants be restrained from refusing 1962 acreage allotments for the disputed tracts and from taking any action to collect the penalties for the 1962 crop.

On September 12–14, 1962, the appeals of the plaintiffs were heard by the Review Committee. On September 27, 1962, the findings of facts and determination of the Review Committee were entered. That Committee determined that the allotments in question were properly cancelled. On October 17, 1962, the plaintiffs filed another action in this Court designated as Civil No. 2451. The defendants to that action were the members of the Culberson County Committee and the members of the Review Committee. In that action the jurisdictional allegations were:

"1. The jurisdiction of this Court is invoked under the general equity powers of the Court, U.S.C. Title 28, Sections 1331 and 1337; the Declaratory Judgments Act, U.S.C. Title 28, Sections 2201 and 2202; the Administrative Procedure Act, U.S.C. Title 5, Sections 1001, 1009; and the Agricultural Adjustment Act of 1938, as amended, Section 365, U.S.C. Title 7, Section 1365. The action arises under the Agricultural Adjustment Act of 1938, as amended, U.S.C. Title 7, Section

1281, et seq. and regulations promulgated by the Secretary of Agriculture thereunder, 7 C.F.R. Ch. VII."

The plaintiffs in their brief state that in Civil No. 2451 they sought in the alternative:

" * * * (1) that this Court declare that the cancellation of the allotments and the subsequent imposition of the sanctions were illegal and that the review of this action was beyond the jurisdiction of the Review Committee; or, (2) that this Court review the determination of the Review Committee pursuant to Section 365 of the Agricultural Adjustment Act, set such determination aside and reinstate the allotments."

On October 17, 1962, the plaintiffs made an application for a preliminary injunction which was granted by the Court upon the furnishing of an injunction bond. The requisite bond was furnished. Under the preliminary injunction the defendants were, in substance, restrained from taking any action in regard to collecting penalties for the 1961 and 1962 cotton crops upon the disputed tracts pending final determination. That preliminary injunction has been continued and is still in effect. By Court order the two actions were consolidated in this one action which is designated as Civil action No. 2438.

On appeal to the Review Committee all of the appellants challenged the action of the Culberson County Committee in reducing to zero the allotments to the tracts involved. On appeal to the Review Committee the Chandlers also challenged the correctness of the amount of the penalties fixed by the County Committee for the year of 1961. The Review Committee was composed of three members. The findings, conclusions and determinations of the Committee were concurred

in by two members of the Committee. One member dissented. Both the majority and the minority filed extensive findings of fact. The findings, conclusions and determinations made by the majority of the Committee constitute the findings, conclusions and determinations of the Committee and will be referred to as such. The Committee held that the allotments in question were properly reduced to zero. It also held in accord with the contentions of the Chandlers that the penalties for the year 1961 had been incorrectly computed. The correctness of the computation is not involved in this proceeding.[1]

The plaintiffs herein, by the civil action designated as Civil Case No. 2451, have brought before this Court for review the findings, conclusions and determinations of the Review Committee as to the allotments in question. By that action and by Civil Case No. 2438 they have also brought before the Court for consideration certain other contentions made by them. Those contentions are centered around a legal challenge relating to administrative procedure. That challenge presents legal questions which are determinable by this Court. That challenge will be later considered. The review phase of the present proceedings will be next considered.

■■ There will first be considered the nature of the review by the Review Committee and by this Court. Section 1363, Title 7, U.S.C.A., provides that any farmer who is dissatisfied with his farm marketing quota may have such quota reviewed by a Review Committee. The hearing before the Review Committee is a *de novo* hearing. Graham v. Lawrimore (4th Cir. 1961), 287 F.2d 207; United States v. Stangland (7th Cir. 1957), 242 F.2d 843. The determination of the Review Committee is reviewable by a bill in equity filed in the proper court. Section 1365, Title 7, U.S.C.A.

---

1. The Chandlers gave notice of appeal from the penalty notices issued in connection with the 1962 crop. The Review Committee did not pass on those notices. Reference will be made later to that matter.

Section 1366, Title 7, U.S.C.A., provides, in part:

"The review by the court shall be limited to questions of law, and the findings of fact by the review committee, if supported by *evidence* shall be conclusive. * * *" (Emphasis supplied.)

Section 1366 makes use of the word "evidence." The greater number of federal statutes relating to the findings of facts of administrative agencies make use of the term "substantial evidence." It is well settled that the word "evidence" used in a statute relating to findings of facts of administrative agencies means "substantial evidence." Universal Camera Corp. v. National Labor Relations Board (1951), 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

The United States Court of Appeals for the Fifth Circuit holds that "substantial evidence" means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Continental Casualty Company v. Holmes (1959), 266 F.2d 269, 276, certiorari denied (1959), 361 U.S. 877, 80 S.Ct. 140, 4 L.Ed.2d 114. That Court cites in support of that definition the statement of Chief Justice Hughes in the case of Consolidated Edison Co. v. National Labor Relations Board (1938), 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126.

In 73 C.J.S. Public Administrative Bodies and Procedure § 126, p. 447, it is stated:

"In an adjudicatory proceeding before an administrative body, it is for the administrative body to determine the weight and sufficiency of the evidence, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence."

An administrative agency has the right to and should appraise the totality of the situation presented by the evidence. American Nat. Bank v. National Labor Relations Board (8th Cir. 1944), 144 F.2d 268, 270. In passing upon the question as to whether findings of facts by an administrative agency have a substantial basis, the reviewing court must take the entire record into consideration, including whatever in that record detracts from its weight. Universal Camera Corp. v. National Labor Relations Board, supra. The conclusive effect given to administrative findings of facts includes the inferences from the evidence if there is a substantial basis for such inferences. Carqueville v. Flemming (7th Cir. 1959), 263 F.2d 875, 877. Inferences drawn by an administrative agency which are supported by substantial circumstantial evidence have a substantial basis. American Nat. Bank v. National Labor Relations Board, supra. In a judicial review of the findings of facts of an administrative body where oral testimony had been presented before that body bearing upon the material facts, the fact that that body had the opportunity to observe the appearance and demeanor of the orally testifying witnesses is to be taken into consideration. Gamble-Skogmo, Inc. v. Federal Trade Commission (8th Cir. 1954), 211 F.2d 106, 113.

The hearing before the Review Committee was quite lengthy. Fred Chandler, Sr., Fred Chandler, Jr., and a number of the other plaintiffs testified orally before the Committee. There was also other oral testimony and numerous exhibits. Fred Chandler, Sr., testified at length and was cross-examined at length. The plaintiffs, among other witnesses, presented M. K. Woodward. He is a professor on the faculty of the School of Law of the University of Texas. His special fields are real property law, real property mortgage law, and oil and gas. He testified at length as to the various aspects of those fields of law in relation to the transactions in question. He also testified as to the practices and customs in those fields.

In the present case there is under review the findings of facts of the Review Committee. The federal courts and the state courts make use of the terminology of ultimate facts and basic facts. 2 Davis, Administrative Law Treatise, Sec-

tion 16.06, p. 449. In the same Section, on page 451, the author states:

"The basic findings are those on which the ultimate finding rests; the basic findings are more detailed than the ultimate finding but less detailed than a summary of the evidence. * * *."

In the case of Saginaw Broadcasting Co. v. Federal Communications Commission (1938), 68 App.D.C. 282, 96 F.2d 554, certiorari denied sub nom. Gross v. Saginaw Broadcasting Co. (1938), 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391, the Court, in discussing the matter of findings of facts by administrative agencies, stated (96 F.2d p. 559):

"* * * The process necessarily includes at least four parts: (1) evidence must be taken and weighed, both as to its accuracy and credibility; (2) from attentive consideration of this evidence a determination of facts of a basic or underlying nature must be reached; (3) from these basic facts the ultimate facts * * * are to be inferred, or not, as the case may be; (4) from this finding the decision will follow by the application of the statutory criterion. * * *"

The record in the present case and the findings of the Review Committee show that it proceeded in the manner just outlined. That Committee made very complete findings as to the basic facts. From those facts and the inferences drawn therefrom the Committee made a finding as to the ultimate facts. Its finding as to certain ultimate facts contained in Finding of Fact No. 18 is of key importance. That finding is as follows:

"The transactions by which the applicants obtained deeds to the farms in question were not for the purpose of reestablishing the farming operations of the applicants as displaced owners but were schemes and devices to sell the allotments and to transfer the allotments for the benefit of Fred Chandler, Sr., and Fred Chandler, Jr."

Prior to the time of the transfer of the allotments in question the Oklahoma cotton allottees and the members of the Culberson County Committee all knew and understood that it would be unlawful for a cotton allottee to transfer his cotton allotment, except to a tract of land he had purchased for the purpose of reestablishing his farming operations. Therefore, when each of the Oklahoma cotton allottees made application to transfer his cotton allotment to a tract of land in Texas, the application itself constituted a representation that the transfer sought to be made was for the purpose of reestablishing his farm operations on such tract and was not for the purpose of effecting a sale or transfer of the allotment for the benefit of the Chandlers. The Chandlers also knew and understood that it would be unlawful for the Oklahoma cotton allottees to sell or transfer their cotton allotments to them for their benefit. Fred Chandler, Sr., is a lawyer and a member of the Texas Bar and had previously served on the Texas State ASC Committee.

The finding of the Review Committee above set forth was, in substance and effect, that the transfers in questions were procured by fraud practiced on the Culberson County Committee and were void ab initio. The determination of the Review Committee was that the allotments in question were cancellable because of such fraud. That finding of the Review Committee is based upon inferences drawn by it from the basic facts which it found had been established by the evidence.

The parties are not in serious controversy as to the basic evidentiary facts as found by the Review Committee. They are in serious controversy as to the inferences apparently drawn by the Committee from certain of those facts and from the record as a whole. Certain facts found by the Review Committee, which are seemingly of pertinence, will next be considered.

It was heretofore noted that in the summer of 1960 Fred Chandler, Sr., entered into arrangements with Harvey

White, the Performance Supervisor of the Custer County, Oklahoma, ASCS Office, and Russell Dill, the County Office Manager in the same office, to render services for him for compensation. Fred Chandler, Sr., testified that they were employed for the purpose of assisting them in meeting the Oklahoma farmers whose farms had been taken by eminent domain. He further testified in regard to their employment as follows;

"My understanding as related to me by them, each of them, was that they had discussed the matter with their county ASC chairman * * * and he asured them that there was nothing wrong with it that he could see, so long as they didn't work in helping me to contact these men and to sell this land at any time during the hours of their employment with the committee."

He further testified that the services rendered by Harvey White and Russell Dill were rendered mornings before work and afternoons and evenings after work. Fred Chandler, Sr., testified that he had not made any specific agreement with them as to the amount of their compensation until after the transactions had been consummated but that after the transactions had been consummated he agreed to pay them ten dollars per basic cotton allotment acre for the sale of the land. On May 30, 1961, he paid Harvey White the sum of $1,765 and on June 15, 1961, he paid Russell Dill the sum of $1,765. The two payments amounted to ten dollars per acre for the basic cotton allotment acres. The allotment acres transferred amounted to 350.4 acres. The payments were not made until after the transfers had been approved by the Culberson County Committee. After an investigation was started in regard to the transactions, Harvey White and Russell Dill repaid the amounts received by them by checks payable to the Chandler Company. The Review Committee in its findings set forth in detail the transactions between the Chandlers and Harvey White and Russell Dill. It is clear that neither of them had any dis-

cretionary authority in connection with the transfer of cotton allotments. The plaintiffs contend that such being the case no unfavorable inferences could be properly drawn from the parts played by Harvey White and Russell Dill. The Government contends that the Review Committee could properly draw certain unfavorable inferences from the arrangements between the Chandlers and Harvey White and Russell Dill. The Government concedes that neither Harvey White nor Russell Dill had any discretionary authority in connection with the transfers. However, it contends that by virtue of their official positions their association with the Chandlers would, in the first instance at least, give the proposed arrangements an aura of legality and Governmental approval. The Government argues that the Chandlers, by making arrangements so that Harvey White and Russell Dill had a stake in the transactions, necessarily restrained them from giving objective advice to the displaced owners. The plaintiffs in their brief and argument state as follows in connection with the matter of the employment of Messrs. White and Dill by Fred Chandler, Sr.:

"Mr. Chandler testified that he had engaged the services of Messrs. White and Dill to assist him in locating displaced farmers in Custer County to whom he could present an offer to sell land in Culberson County, Texas. The Government's contention that Mr. Chandler engaged their services 'to render assistance in obtaining pooled cotton allotments' is wholly unfounded. The evidence indicates that neither Mr. White nor Mr. Dill, nor the County Committee for which they were employed had any power to effect the transfer of pooled allotments.

"The record shows that the compensation received by Messrs. White and Dill was conditioned not upon the approved transfer of pooled allotments, but upon the number of acres of allotment in the pool to the credit

of the displaced owners who purchased land from Mr. Chandler. Messrs. White and Dill were to perform their services for Mr. Chandler during time not committed to their employment with the Department of Agriculture. The record further shows that the Oklahoma farmers were not advised by Messrs. White and Dill regarding the transfer of their allotments, nor did they know of Messrs. White and Dill being employed by the Chandlers.

"Whether or not Mr. Chandler's employment of Messrs. White and Dill was improper is not a question relevant to the cancellation of the allotments in dispute. * * *."

The Chandlers made what are referred to as earnest money payments to the Oklahoma allottees before leases to the Texas tracts were executed and before the transfer of the allotments had been approved and before the allottees had seen the Texas land. On cross-examination Fred Chandler, Sr., testified in regard to that matter as follows:

"Q * * * you paid out the money, you paid out ten per cent of the lease money without ever having a lease, and you never required a single penney [sic] and downpayment on the land?

"A That's correct, we had faith in them and evidently they had faith in us."

Fred Chandler, Sr., then made reference to the matter of chances that have been taken. His cross-examination then continued as follows:

"Q What do you mean, there has been some chances taken?

"A I mean whether or not it would go through when we agreed to pay ten per cent down on this, and I mean other chances were taken. Whether we would go ahead and lease the land for what I think is a very substantial price, even though the allotment might terminate next year."

Fred Chandler, Sr., further testified on cross-examination that the ten per cent payment was in the form of earnest money and that if the deal did not go through the Oklahoma allottees could retain the earnest money. The Government contends the arrangement in regard to earnest money was most unusual in that normally it is the purchaser of land rather than the seller thereof who makes an earnest money payment and that, therefore, the earnest money arrangement tends to give an air of unreality to the entire situation. The plaintiffs contend that the arrangement does not do so.

Sometime during the period between January 26 and February 11, 1961, Fred Chandler, Sr., prepared the deeds to the tracts in question. They were all prepared at the same time. He determined the shape and location of each of the tracts described in the deeds. The Oklahoma allottees accepted the deeds without being furnished abstracts of title to the tracts described therein and without title examinations. It was disclosed later that there were errors in seven of the deeds. The original deed to A. N. Easley was executed by Fred Chandler, Sr., and Fred Chandler, Jr., although title to the tract described in that deed was in the Capitan Company. Seven correction deeds were later executed. The larger tracts from which the tracts described in the deeds were carved out of had been conveyed to the Chandlers subject to the reservation of certain mineral rights. No reservations of mineral rights were made in the deeds to the Oklahoma allottees. The first time any of those allottees saw any of the land described in the deeds was at the time some of them came down to Texas for the hearing on the applications for transfer before the Culberson County Committee on February 17, 1961. The Chandlers paid part of the expenses of some of the Oklahoma allottees for their travel to Texas. Fred Chandler, Sr., caused the deeds to be recorded and paid the recording fees. The Government contends that all of the facts referred to strongly indicate complete indifference to and complete lack of

concern on the part of the Oklahoma allottees as to the character, location, and the state of the title to the tracts allegedly purchased by them and that such being the case such inference, with other properly drawn inferences, would give support to the finding of the Review Committee that the transactions did not constitute bona fide purchases of the tracts by the Oklahoma allottees for the purpose of reestablishing their farming operations but, in reality, were a disguised sale of the cotton allotments for the benefit of the Chandlers. The plaintiffs contend that no such unfavorable inference should be drawn. They contend that the record shows that the Oklahoma allottees had complete confidence in Fred Chandler, Sr., and they relied upon and trusted him to see that they received suitable tracts and proper title thereto. In regard to the fact that the deeds to the Oklahoma allottees did not make any reservations of mineral rights, the plaintiffs in their brief and argument stated that this feature was without relevance. They further stated as follows:

" * * * The Oklahoma farmers and the Chandlers had no interest in the transfer of mineral rights. Their sole consideration was the transfer of land suitable for cotton farming. Mr. Chandler intended to convey all his interest in the lands in question, and the deeds he gave the Oklahoma farmers fulfilled this intention. However, Mr. Chandler's failure to specify this reservation, plaintiffs concede, constitutes a technical breach of his general warranty of title."

 In each case the tract described in the deed was leased back to the Chandlers for a twenty-year period with the rent payable in a lump sum. Fred Chandler, Sr., testified that he would not have sold the tracts to the Oklahoma allottees unless they would lease them back to him. Thus, the leasing arrangements were an integral part of the transactions. The plaintiffs contend, and correctly so, that it is proper and lawful for an owner of land having a cotton allotment to lease such land and to have cotton produced thereon to the extent of the allotment by the lessee. The plaintiffs contend, and correctly so, that the Oklahoma allottees could properly and lawfully purchase land for the purpose of reestablishing their farm operations and carry on such reestablished farm operations by lease arrangements. The Government concedes that such is the case. However, it contends that the character, nature and terms of the leases in question and the circumstances surrounding them were such that the Review Committee could properly draw the inference that the leasings were, in reality, a part of the claimed disguise. Fred Chandler, Sr., testified that during the negotiations he proposed to lease the tracts involved on the basis of $100 per cotton acre allotment, except in the case of Hubert Kephart who had a very large allotment. The basis in his case was to be $125 per cotton allotment acre. While each lease specified a lump sum payment for the twenty-year term, none of them specified when the lump sum was to be made. Fred Chandler, Sr., in his testimony before the Review Committee, was asked as to what the understanding was as to the payment of the lump sum rent. In that regard he testified as follows:

" * * * When we settled down there and agreed on this lease, the terms and all, we had in mind, and I think I had conveyed it to them [the displaced owners] that we would pay it if they wanted it at the time the leases were executed, * * * one of them at a time, different ones spoke up * * * they decided they would much rather have their lease money, half of it in March of '61 and the other half in March of '62, but they had already received ten dollars per cotton allotment acre, that was earnest money, what I call it. Therefore, those who wanted their first half in March of '61 included that ten dollars, that which happened to be ten per cent, I believe, that they received. * * * "

Fred Chandler, Sr., further testified that L. M. Stout wished all of his rent then and that Vernon McLaughlin desired all of his in March, 1962, and that Hubert Kephart wished only a small part of his rent then. Thus, it appears that the Oklahoma allottees were entitled to be paid the lump sum rent payment at the time the leases were executed if they so desired. In the case of all of the Oklahoma allottees, except two, the lump sum rent payment was equal to $100 per acre for their cotton allotment acres. In the case of Vernon Fletcher the lump sum rent payment was equal to $103.26 per acre for his cotton allotment acres and in the case of Hubert Kephart the lump sum rent payment was equal to $125 per acre for his cotton allotment acres. Each lease provided that the lessee should pay the real estate taxes on the leased premises.

The Government contends that the situation as to the leases was such as to properly permit the Review Committee to draw unfavorable inferences as to the transactions. The Government stresses that under the arrangements the lump sum rent payment in each case was equal in amount to the amount agreed upon as the value of the allotments and that the allottees were entitled to that sum immediately upon the execution of the lease, or, in other words, the allottees were entitled to receive and did receive payment on a cotton allotment acre basis of the value per acre which was recognized by the parties as the value of such cotton allotment acres. The Government calls attention to the length of the leases, the feature of immediate lump sum payments for the entire twenty-year term, and the lease provisions making the payment of the real estate taxes the obligation of the lessee. The Government argues that the provision for the payment of the real estate taxes by the lessee would have the effect of protecting the lump sum payments against being cut into by the payment of future real estate taxes when the allottees would be receiving no current income from the tracts. The Government contends that all of the

features of the leases referred to would properly permit the Review Committee to draw inferences which would support its conclusion as to the real nature of the transactions. The plaintiffs contend that none of the lease features referred to are unusual and presented evidence before the Review Committee to that effect. The plaintiffs further contend not any one or all of the lease features referred to would properly permit the Review Committee to draw unfavorable inferences as to the transactions.

It was heretofore noted that the Oklahoma allottees and Fred Chandler, Sr., had orally agreed that if he drilled any wells on any of the tracts the owner would sell him the acre of land on which the well was located. It appears that irrigation was necessary in order to grow cotton on the tracts in question and that irrigation would have to be made by means of wells and irrigation ditches. Fred Chandler, Sr., testified, in substance, that it would be difficult for them to finance the drilling of the wells unless they owned the land around the well. He further testified that it would cost around $20,000 to drill a well and that the Chandlers had drilled four pretty good wells on three tracts.

The lands described in the deeds to the Oklahoma allottees were located in three different Sections: 90 acres in Section 3; 480 acres in Section 9; and 464.4 acres in Section 40. The tracts in Sections 3 and 9 were subject to a blanket overriding first lien in favor of Paul Teas, Jr., and L. S. Sutherland. That lien secured the sum of $35,000 payable in twenty annual installments with interest payable on December 1 of each year. It was first agreed between Paul Teas, Jr., L. S. Sutherland, and the Chandlers that the Chandlers were to have the privilege of paying the full amount secured by the lien on December 1, 1961. Later it was agreed between them that the Chandlers could pay one-half of the amount secured by the lien on December 1, 1961, and the other half on December 1, 1962, if they desired. The tracts in Section 40 were subject to a blanket over-

riding lien in favor of Paul Teas, Sr., securing the sum of $17,274 payable in ten annual installments with the interest payable on January 19 of each year. It was the testimony of the plaintiffs that the consideration for the tracts conveyed to the Oklahoma allottees was $55 per acre, which consideration was made up of the following items: the assumption by each of them to the amount of $35 for each acre conveyed of the overriding lien thereon and the payment by each of them to the Chandlers of $20 per acre for the clearing of the land conveyed. The feature of the Oklahoma allottees agreeing to pay a portion of blanket overriding liens was the subject of testimony at the hearing before the Review Committee. Fred Chandler, Sr., testified that he had no definite agreement with the lienholders and with the Oklahoma allottees that any of the allottees could secure a release of his tract from the overriding lien by the payment of the $35 per acre assumed by him. The Review Committee found that the Oklahoma allottees had no agreement under which they could secure a release of their tracts from the blanket overriding liens by the payment of the $35 per acre specified in their deeds. The Government contends that the situation just referred to was of such a nature as to permit the Review Committee to properly draw an inference which, with other properly drawn inferences, would give support to the finding of the Review Committee as to the nature of the transactions. In connection with this matter the plaintiffs in their brief and argument state as follows:

"There has been no agreement negotiated between the Oklahoma farmers and the prior lien holders for the release of the lien as to the individual Oklahoma farmer as his purchase price is paid. Mr. Chandler had secured from the prior lien holders, a partial segregation of the land purchased by the Oklahoma farmers from the total indebtedness owed by Mr. Chandler to them. However, release of the lien against the land purchased by the Oklahoma farmers cannot be obtained unless Mr. Chandler satisfies a part of the total secured indebtedness. Mr. Chandler has expressed full intention of doing this, and the Oklahoma farmers are satisfied with this arrangement. As Professor Woodward has observed, this is not a model conveyance, however, the parties are satisfied to rely upon their faith in each other and the absence of an agreement of this nature has no effect upon the passage of ownership from the Chandlers to the Oklahoma farmers."

The Government also calls attention to the fact that in the deeds which contained the assumption clauses no reference was made as to the matter of the installment payments or interest on the overriding liens and that no schedule of payment was set forth. It claims that an unfavorable inference could properly be drawn by the Review Committee because of that feature. In connection with this feature the plaintiffs in their brief and argument state:

"Each of the plaintiffs assumed an obligation to pay a specified dollar amount of a pre-existing obligation of the Chandlers. The times of payment of the Chandlers' obligation were set forth in other instruments. When the plaintiffs assumed their obligation to pay a prescribed portion of these obligations, they assumed the obligation to make those payments when the Chandlers' obligations became due."

The plaintiffs contend that no unfavorable inference could properly be drawn from the feature referred to. The Review Committee found that in the summer of 1961, after the Department of Agriculture had started investigating the transactions, Fred Chandler, Sr., went to Custer County and met with most of the applicants and that he prepared and presented a schedule of payments to be made by them and that those scheduled payments were equal to one-tenth of the purchase price exclusive of clearing costs, plus interest, in the case

of the tracts in Section 40 and one-half of the purchase price exclusive of clearing costs, plus interest, in the case of the tracts in Sections 3 and 9. The Department of Agriculture continued its investigation of the transactions. On December 1, 1961, an annual principal payment installment and interest was due on the overriding lien on the tracts in Sections 3 and 9 and on January 19, 1962, an annual principal payment installment and interest was due on the overriding lien on Section 40. The Review Committee made the findings hereinafter set forth in regard to those payments:

"(a) On December 1, 1961, Chandler Company paid Paul Teas, Jr., and L. S. Sutherland $566.21 on behalf of Jack Kenney. Thereafter on March 1, 1962, Chandler Company paid Jack Kenney the balance of the lease money in the sum of $500.00 without deduction.

"(b) On December 1, 1961, Chandler Company paid $566.21 to Paul Teas, Jr., and L. S. Sutherland for Paul Kenney. On March 13, 1962, Chandler Company paid Paul Kenney $500.00 as a balance of the lease money without deduction.

"(c) On December 1, 1961, Chandler Company paid $566.21 to Paul Teas, Jr., and L. S. Sutherland for Vance Kenney and on either March 13, 1962, or August 13, 1962, paid Vance Kenney $500.00 as the balance of the lease money without deduction.

"(d) On December 1, 1961, Chandler Company paid $566.21 for L. M. Stout to Paul Teas, Jr., and L. S. Sutherland and has made no effort to collect from Stout.

"(e) On December 1, 1961, Cecil Brown paid Paul Teas, Jr., and L. S. Sutherland $566.21, and on November 29, 1961 was paid $635.00 by Chandler Company as the balance due on the rent.

"(f) On December 1, 1961, A. N. Easley paid Paul Teas, Jr., and L. S. Sutherland $1,698.64, and on November 29, 1961, A. N. Easley was paid $1,610.00 by Chandler Company as the balance due on the rent.

"(g) On December 1, 1961, A. H. Crawford paid Paul Teas, Jr., and L. S. Sutherland $1,132.42, and on November 29, 1961, A. H. Crawford was paid $1,150 by Chandler Company as the balance due on the rent.

"(h) On December 1, 1961, J. R. Kenney paid Paul Teas, Jr., and L. S. Sutherland $206.64 and on the same date J. R. Kenney paid Paul Teas, Jr., and L. S. Sutherland $2,-264.85. On March 13, 1962, Chandler Company paid J. R. Kenney a total of $2,845.00 the balance due on rent money.

"(i) On December 1, 1961, Vernon McLaughlin paid Paul Teas, Jr., and L. S. Sutherland $2,264.85. On March 13, 1962, Chandler Company paid Vernon McLaughlin $3,942.00 as balance due on rent money.

"(j) On December 1, 1961, Woodrow Gum paid Paul Teas, Sr., $232.-42. On November 29, 1961, Chandler Company paid Woodrow Gum $755.00 balance due on rent money.

"(k) On December 1, 1961 * * Jack D. Warner paid Paul Teas, Sr., $232.47. On November 29, 1961, Chandler Company paid Jack Warner $840.00 balance due on rent payments.

"(l) On December 1, 1961, Vernon Fletcher paid Paul Teas, Sr., $232.47. On March 13, 1962, Vernon Fletcher was paid $787.50 by Chandler Company as balance due on rent payments.

"(m) On December 1, 1961, Hubert Kephart paid Paul Teas, Sr., $1,084.86. On March 13, 1962, Chandler Company paid Hubert Kephart $6,000.

"(n) On December 1, 1961, Lewis Kenney paid Paul Teas, Sr., $206.64. On March 13, 1962, Chandler Company paid Lewis Kenney $500.00 balance due on rent.

"(o) On December 1, 1961, Walter S. Kenney paid Paul Teas, Sr., $203.54. On March 13, 1962, Chandler Company paid Walter S. Kenney $500.00 balance due on rent."

At the hearing before the Review Committee the matter of the rent payments in relation to the payments made on the overriding liens was gone into. On re-cross-examination of Fred Chandler, Sr., the following appears:

"Q Mr. Chandler, you had made the first [rent] payment in March of 1961, hadn't you?

"A Yes, sir. Those who wanted it then, yes, sir.

"Q And then this next payment was to be a year later in March of 1962?

"A Yes, sir.

"Q What is your explanation that they didn't have any arrangements to make this payment due in December 1, 1961?

"A You mean those who didn't have?

"Q Yes?

"A Well, I'll tell you, that's a little hard to explain. To me—I'll just have to say what I think about it—it was kind of a feeling of indifference, lack of interest."

Earlier in his testimony Fred Chandler, Sr., testified, in effect, that the reason some of the Oklahoma allottees wanted part of the rent payment made in 1962 was because they had received substantial sums for their condemned lands and considered it desirable for income tax purposes to have part of the rent payments made in 1962.

It appears from the record that at the time the transactions were entered into some of the Oklahoma allottees had received their condemnation awards. However, some of the allottees litigated the amount of the proposed awards and the litigation had not been completed at that time.

The Government points out that the record indicates that the Oklahoma allottees apparently did not make use of the proceeds received by them for their condemned land towards the purchase price of lands allegedly purchased by them for the purpose of reestablishing their farming operations and that the payments made on the purchase price of those tracts were made as heretofore set forth.

The Government in its brief makes the following argument:

" * * * The purchasers for the most part had received $50 per allotment acre and were to receive $50 more by March 15, 1962. However, before making any payment Jack Warner, Woodrow Gum, A. N. Easley, Cecil Brown and A. H. Crawford required Chandler Company to pay in advance the rent payment due March 15, 1962. These people had received a rent payment in the spring of 1961 but apparently had given no consideration to making a payment on the purchase price on December 1, 1961. * * *."

The Government makes the following reference to the payments on behalf of L. M. Stout, Jack Kenney, Paul Kenney, and Vance Kenney:

" * * * L. M. Stout made no payment out of his own funds. He had received all of the rent money and yet Chandler and Company advanced the money and have made no effort to collect from him. Jack Kenny, Paul Kenny, and Vance Kenny made no payment from their own funds. The payments were advanced by Chandler and Company and yet Chandler and Company on March 1, 1962 paid Jack Kenny $500 without deduction for the advance, paid Paul Kenny $500 on March 13, 1962 without deduction for the advance, and on March 13, 1962 paid Vance Kenny $500 without deduction for the advance. * * *."

The Government contends that the payments were made because the continuing investigation of the transactions by the Department of Agriculture rendered it

necessary that a showing be made that the Oklahoma allottees were making payments on the purchase price on the tracts allegedly purchased by them. The Government contends that the surrounding circumstances relating to the matter of the payments of the purchase prices were such as to indicate an indifference and lack of concern on the part of the allottees as to the payment of the purchase price and that the Review Committee could properly draw inferences therefrom which, with other properly drawn inferences, would give strength to their conclusion that the allottees regarded the transactions as being transactions for the sale or transfer of their cotton allotments for the benefit of the Chandlers rather than the purchase of tracts for the purpose of reestablishing their farming operations thereon. It is the claim of the plaintiffs that the payments made on the overriding liens were made pursuant to bona fide and valid agreements. They contend that no unfavorable inference or inferences could be properly drawn by the Review Committee from the situation disclosed by the record as to those payments.

The deeds accepted by the Oklahoma allottees provided that they should pay the sum of $20 per acre for the cost of clearing the land conveyed to them. The Review Committee found that " * * * there is not now any agreement as to when and how the $20.00 per acre clearing costs are to be paid." Fred Chandler, Sr., testified on cross-examination before the Review Committee that the clearing costs were to be paid at some later date. It appears that the Hubert Kephart tract had been cleared at the time the deed was delivered to him. It further appears that all of the tracts in question had been cleared at the time of the hearing before the Review Committee. It further appears that no request for payment for the clearing costs has been made. Fred Chandler, Sr., testified before the Review Committee that payment had not been requested from the Oklahoma farmers for clearing costs because the transactions had all been questioned by the Department of Agriculture. The Government claims that the record indicates that the clearing had been completed on the Hubert Kephart tract prior to any investigation by the Department of Agriculture, yet no request for payment of the clearing costs was made upon him. The Government further claims that the record indicates that although the clearing of other tracts had been completed before the Chandlers had completed all of their rent payments the Chandlers did not deduct the clearing costs from those rent payments.

The Government contends that the record indicates a lack of concern and indifference by the parties as to the payment of the clearing costs. It further contends that from such lack of concern and indifference the Review Committee could properly draw an unfavorable inference as to the bona fides of the transactions. The plaintiffs contend that the record shows that the Oklahoma farmers had entered bona fide and valid agreements to pay for the clearing costs and that the actions of the parties in relation thereto have reasonable explanations.

In the case of McGovern v. City of New York (1923), 234 N.Y. 377, 138 N.E. 26, 25 A.L.R. 1442, in an opinion by Judge Cardozo, it is stated (p. 32 of 138 N.E.):

"* * * The underlying realities of plan and purpose and effect must prevail over the form or the disguise which may incumber or belie them. * * *"

The finding of the Review Committee heretofore referred to was, in substance, to the effect that the underlying realities of plan and purpose were to sell the cotton allotments in question for the benefit of the Chandlers and that such plan and purpose was effected under the guise of conveyances and leases back.

The Oklahoma allottees secured deeds to particular tracts which were placed of record. Thus, each of them was the holder of record title to the land described

in the deed running to him. If, as the Review Committee found, the transactions were guises for the sale of cotton allotments rather than purchases of land, it is obvious that it would be necessary at some time in the future that record title to the tracts be in the Chandlers or their nominees. Each deed specified certain obligations on the part of the grantee as to the purchase price. Professor Woodward, who, as heretofore noted, was a witness for the plaintiffs, testified that under the Texas law the ownership to each of such tracts was vested in the grantee of the deed. He further testified that under the Texas law the Chandlers had an implied vendors' lien on each tract as security for the performance by the grantee thereof of the obligations to be performed by him for their benefit. He further testified that in the event that any grantee failed to perform any of those obligations the Chandlers could foreclose their vendors' lien on the particular tract, in which event the tract would be sold on foreclosure sale. The Government argues that the Chandlers could reacquire record title to a particular tract in two ways. The grantee of a particular tract could, in effect, abandon his record ownership by not fulfilling his obligations as to the purchase and allow the Chandlers to reacquire record title by means of foreclosure of their vendors' lien, or at some future time such grantee could execute a quit claim or other form of deed to the tract in favor of the Chandlers. Fred Chandler, Sr., and the Oklahoma allottees testified before the Review Committee that they had not entered into any agreement or understanding whereby ownership of the tracts in question was to be revested in the Chandlers.

The Review Committee made extensive findings as to the facts and circumstances surrounding the transactions. It then made Finding No. 17 which is as follows:

"Based on the facts and circumstances set forth above, the Committee finds that at the time the applicants made application to the Culberson County Committee to transfer the cotton allotments from the eminent domain pool the applicants and the Chandlers had an understanding to the effect that the applicants were not obligated to pay for the land covered by the deeds in question and were privileged to retain the money ostensibly paid under the leases and that the Chandlers would keep up the required payments on the first liens. * * *."

The plaintiffs vigorously assert that such finding does not have substantial evidentiary support. They contend, and correctly so, that there is no direct evidence in the record as to any agreement or understanding between the parties that the transactions were to be otherwise than as appeared from the deeds and leases. They contend that the facts and circumstances were not such as to provide substantial evidentiary support for the finding of the Review Committee that the transactions were otherwise than as appeared from the deeds and leases. They point out that they presented evidence to the effect that each feature of the transactions from which the Review Committee apparently drew unfavorable inferences was either a usual feature of real estate transactions or was not so unusual as to give adequate support to any unfavorable inferences. In the case of Schlitz Brewing Co. v. Houston Ice & Brewing Co. (1919), 250 U.S. 28, 29, 39 S.Ct. 401, 63 L.Ed. 822, the Court stated: "It is a fallacy to break the fagot stick by stick." It was the duty of the Review Committee to consider the totality of the circumstances as shown by all of the evidence. In that connection it was entitled to take approaches to the evidence similar to those taken by the courts. In the case of Minnesota Tea Co. v. Helvering (1938), 302 U.S. 609, 613, 58 S.Ct. 393, 394, 82 L.Ed. 474, the Court stated: "A given result at the end of a straight path is not made a different result because reached by following a devious path."

The findings of the Committee were, in effect, that a fraud had been committed upon an agency of the United

States. In the case of Merchants' Nat. Bank v. Greenwood (1899), 16 Mont. 395, 41 P. 250, the Court stated (p. 259 of 41 P.):

> " * * * Fraud cannot often be proven by direct evidence. Fraud conceals itself. It does not move upon the surface in straight lines. It goes in devious ways. * * * It is rarely that we can lay our hand upon it in its going. We are more likely to discover it at its destination, before we know that it has started upon its sinuous course. * * * "

The Review Committee, in effect, found that the destined end of the transactions was the sale of cotton allotments and not the purchase of lands. If such were the case then it would not be necessary for the Review Committee to specify the devious way or ways the parties may have had in mind to get the record titles to the tracts involved back to the Chandlers or their nominees.

 It is the holding of the Court that the findings of fact made by the Review Committee as to the real nature of the transactions are supported by substantial evidence. However, that holding is not determinative as to the present litigation. The plaintiffs have raised other issues. Those issues have to do with the matter of the jurisdiction of the Review Committee and certain matters relating to administrative procedure.

One of the issues as to administrative procedure raised by the plaintiffs is related to a certain regulation. Prior to February 14, 1961, the Secretary of Agriculture had promulgated some brief regulations relating to the transfer of allotments where the land to which they had pertained had been taken by eminent domain proceedings. On February 14, 1961, the Secretary promulgated a lengthy regulation relating to such transfers, which was Amendment 11 to the Farm Allotment Regulations. 26 F.R. 1396. It was published in the Federal Register on February 17, 1962. That regulation now appears as part of Section 719.12 of the Code of Federal Regulations, Title 12. It provides, in part:

> "Upon written application by the displaced owner by August 29, 1961 or within three years after such owner is displaced, whichever is later, to the county committee of the county in which the farm which is to receive allotment from the pool is located, the county committee shall determine whether the transaction by which the displaced owner claims to have acquired the farm to which it is requested that the allotment be transferred and the requested transfer is for the purpose of reestablishing the farming operations of the displaced owner or is a scheme or device to sell the allotment or to transfer the allotment for the benefit of some person other than the displaced owner. The application for transfer shall contain a certification by the applicant that he has made no side agreement with any person for the purpose of obtaining an allotment from the allotment pool for a person other than himself. * * * If an allotment is transferred hereunder and it is later determined by the county committee that the transfer was obtained by misrepresentation by or on behalf of the applicant the allotment for the farm shall be reduced by the amount of the transfer for each year the transfer purportedly was in effect * * *. If the county committee determines that the transaction by which the displaced owner acquired the farm to which the allotment is to be transferred and the proposed transfer is for the bona fide purpose of reestablishing the farming operations of the displaced owner and is not a scheme or device to sell the allotment or to transfer the allotment for the benefit of some person other than the displaced owner the county committee shall determine the allotment or increase of allotment to be transferred from the pool to such farm. * * *."

The Oklahoma applicants appeared before the Culberson County Committee in connection with the transfer of their allotments on February 17, 1961, and May 22, 1961. It appears that the provisions of the regulation relating to "side agreement" or to "scheme or device" were not called to their attention at the time they appeared before the Culberson County Committee nor was inquiry made of them by the members of that Committee as to those matters. The plaintiffs assert that the provisions of the regulation were vague and indefinite in that they did not define ownership nor contain indicia of ownership in connection with the land to which the allotments were to be transferred. They also assert that the provisions of the regulation were vague and indefinite in that they did not define the words "side agreement" nor the words "scheme or device." The substance of the contention of the plaintiffs in this connection is that the allotments in question were improperly cancelled because the regulation in question was not made known to the Oklahoma allottees at the time their applications for transfer were before the Culberson County Committee and because the regulation in question was so vague and indefinite as to deny them due administrative process.

It seems clear that the propriety of the transfers in question has a sweep which is broader than that of the particular regulation. As heretofore noted, the substance of the findings of the Review Committee and the effect of its determination was that the Oklahoma applicants made applications to the Culberson County Committee for the transfers to tracts in Culberson County, which applications on their face purported to be based upon bona fide purchases of the tracts for the purpose of reestablishing their farming operations thereon but that in truth and fact they were not so based but were made in furtherance of a scheme or device which had for its objective the sale and transfer of the allotments for the benefit of the Chandlers. The Oklahoma allottees had no need of a regulation or regulations either informing them or specifying that such type of transfers was unlawful. They already knew that. The Review Committee found that the transfers in question were procured by fraud. In the case of Massey-Ferguson, Inc. v. Bent Equipment Company (1960), 283 F.2d 12, the United States Court of Appeals for the Fifth Circuit stated (283 F.2d p. 15):

"What we said in White v. Union Producing Co., [5 Cir.] 1944, 140 F.2d 176, 178, is persuasive here: 'Fraud vitiates everything it touches. It is difficult to define; there is no absolute rule as to what facts constituted fraud; and the law does not provide one "lest knavish ingenuity may avoid it." ' Much the same idea was expressed in our decision of Abbott v. United States, [5 Cir.] 1956, 239 F.2d 310, 314, where, quoting from one of our earlier cases and citing several others from various courts, we said: ' * * * the law does not define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity.' "

Where the Government seeks to rescind the action of one of its agencies because of the claimed failure of the agency or the beneficiary of the agency's action to observe and follow certain pertinent regulations, and the only basis for the rescission is the regulations themselves, their rescission can only be had within the bounds of those regulations. However, it is clear that where a certain action on the part of an agency was induced by fraud practiced upon it, the right of the Government to bring about a rescission of that action is not dependent upon the existence of a regulation forbidding such fraud or specifying what acts shall constitute fraud or defining fraud.

It seems clear that the allotments in question could be properly cancelled without fitting the cancellations into the phraseology of the regulation. It appears from the minutes of the Culberson

County Committee that use was made of some of the words appearing in the regulation. It also appears that the Review Committee made use of the words "side agreement" appearing in the regulation. It also appears that the Review Committee made use of the words "scheme" and "device" which appear in the regulation. However, the essence of the findings of the Review Committee was that the transfers in question had been procured by fraud. Further, the words "scheme" and "device" used in the regulation have connotations similar to that of the word fraud and, like that word, would seem to require no definition.

The conduct of the parties as established by the Review Committee was conduct which was prohibited apart from any regulation or regulations. The Court holds that administrative procedure challenge of the plaintiffs based upon the regulation in question is not well taken.

The plaintiffs make two closely connected contentions based upon a recital in the minutes of the Culberson County Committee held on April 26, 1962. Those minutes contain the following recital: "At the direction of the Administrator ASCS, revised farm allotment notices are being furnished the following farm operators and owners * * *." Thereafter in the minutes there is listed the farms in question with their 1961 allotments revised to zero. The plaintiffs contend that the action reflected in the minutes was that of the State Administrator ASCS and not that of the County Committee. Based on that premise, the plaintiffs make the contention that since the Review Committee can only review actions of county committees there was in the present case no action of the County Committee for it to review and hence the action in regard to the allotments reflected in the minutes referred to was not within the review jurisdiction of the Review Committee. The challenge to the jurisdiction of the Review Committee was raised before the Review Committee but was not specifically ruled on by it. However, the Review Committee assumed jurisdiction and thus impliedly held that the review was within its jurisdiction.

Based upon the premise that the action reflected in the minutes referred to constituted cancellation of the allotments in question by the State Administrator ASCS and constituted an administrative cancellation made by such Administrator acting under authority delegated to him by the Secretary of Agriculture, the plaintiffs make a further contention. In that connection they assert that neither the Secretary of Agriculture nor the State Administrator ASCS acting for him had lawful authority to cancel the allotments in question. In the same connection they also assert that if it be assumed that originally the Secretary of Agriculture was vested with authority to cancel cotton allotments which had been improperly issued, such authority could no longer be exercised by him at the time in question. They point out that the Secretary of Agriculture had, by regulations, set up administrative procedures for the issuance, transfer and cancellation of allotments under which those matters, in the first instance, were to be handled by the county committees. They contend that the Secretary of Agriculture, having set up such administrative procedures, could not thereafter lawfully by-pass them. They contend that what occurred in this case was the by-passing by the Secretary of Agriculture of his own regulations. Their contentions require that consideration be given to certain related matters.

Congress made the Secretary of Agriculture responsible under the law for activities within his Department. He is accountable to the President, to Congress, and to the public for the proper administration of the different farm programs. Frauds in connection with those programs would tend to defeat their objectives. The Secretary of Agriculture and those acting for him have the duty and responsibility to protect those programs against frauds. It is clear that when the Secretary has reasonable grounds for believing that a fraud has

been committed in connection with a farm program, it is his duty and responsibility to either take proper action in relation thereto himself or to cause the matter to be brought before a proper administrative agency or proper court for a determination.

There are numerous instances in which it has been charged that a party has induced action on the part of a Department or other agency of the United States to which he was not lawfully entitled. In some cases it has been charged that the action in question was induced by fraud. In other cases it has been charged that the action in question was improper because it was taken in disregard of applicable statutes and regulations. Where the action has resulted in a transaction in which redress can be effected by its rescission several procedures have been used to effect such rescission. In some cases the United States has brought a plenary action to rescind or cancel the transaction or transactions. Typical of such cases is the so-called Teapot Dome case. Pan American Co. v. United States (1927), 273 U.S. 456, 47 S.Ct. 416, 71 L.Ed. 734. In other cases a Department head has administratively rescinded or cancelled the transaction. Typical of such cases is the case of Boesche v. Udall (1963), 373 U.S. 472, 83 S.Ct. 1373, 10 L.Ed.2d 491. In that case there was involved a mineral lease of public land which had been cancelled administratively by the Secretary of Interior on the ground that the lease was invalid in its inception. The Court stated (p. 1376 of 83 S.Ct.):

"We think that the Secretary, under his general powers of management over the public lands, had authority to cancel this lease administratively for invalidity at its inception, unless such authority was withdrawn by the Mineral Leasing Act.
* * *"

The Court held that such authority had not been withdrawn by that Act and sustained the cancellation.

 It is well settled that a Department or agency of the United States is required to follow the procedure provided by its own regulations even though it had authority to provide for such procedure by regulation. Service v. Dulles (1957), 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403; Vitarelli v. Seaton (1959), 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012; Accardi v. Shaughnessy (1954), 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681. In the case of Service v. Dulles, supra, there was involved the validity of the discharge of a Foreign Service Officer by the Secretary of State. Congress, by what was referred to as the McCarran Rider, had given the Secretary of State absolute discretion in the matter of the discharge of Foreign Service Officers. The Secretary of State had promulgated regulations relating to the procedure in connection with the discharge of such Officers. The Secretary of State discharged the plaintiff Service without following the provisions of the regulations. The Court held that the plaintiff Service had been improperly discharged. It stated that while under the McCarran Rider he could have discharged the plaintiff Service in his discretion, yet as long as the regulations remained unchanged he could not proceed without regard to them. In the case of Accardi v. United States, supra, the Attorney General had, by regulations, set up a Board of Immigration Appeals to pass upon immigration deportation appeals. It was a non-statutory board composed of his subordinates. A hearing officer found that the plaintiff Accardi was deportable. The Board of Immigration Appeals affirmed that decision. The Attorney General then ordered him deported. The Court held the deportation order was invalid. It found that the Attorney General had dictated the decision of the Board of Immigration Appeals. The Court stated (p. 267 of 347 U.S., p. 503 of 74 S.Ct.):

" * * * In short, as long as the regulations remain operative, the Attorney General denies himself the right to sidestep the Board or dictate its decision in any manner."

The plaintiffs, in addition to relying upon the cases just cited, also rely upon

the case of John A. Johnson Contracting Corp. v. United States (1955), 132 F. Supp. 698, 132 Ct.Cl. 645. In that case the plaintiff had entered into a construction contract with the United States. The contract contained Article 15, the so-called standards dispute clause, under which disputes arising under the contract concerning questions of fact were to be decided by the contracting officer. It further provided a right of appeal to the Secretary of War whose decision was to be final and conclusive. The Secretary of War had designated the War Department Board of Contract Appeals to hear such appeals. The contracting officer terminated the contract for delay in performance. The War Department Board of Contract Appeals affirmed that decision. The Court of Claims found that the commanding officer of the contracting officer and the attorneys for the Government had influenced the contracting officer to make the decision terminating the contract, which was contrary to the decision he had earlier intended to make. The Court held that the interposition of the contracting officer's commanding officer and the attorneys for the Government nullified the proceedings. The Court, in referring to the decision of the contracting officer, stated (132 F. Supp. p. 706):

" * * * his decision went, on appeal, to the Board of Contract Appeals, clothed, presumably, with some presumption of correctness, because of his competence and his intimate knowledge of the facts. The interposition of the commanding officer and the Government lawyers into the situation, which nullified the contracting officer's decision, were, so far as appears, not known to the plaintiff or to the Board. * * *"

The first question to be considered is as to the character of the part played by the State Administrator at the meeting of the Culberson County Committee on April 26, 1962. The matter of what occurred at that meeting was fully gone into in the hearing before the Review Committee. That meeting of April 26,

1962, was attended by two members of the Culberson County Committee, Dee Wilson and Dick Guest. They both testified orally before the Review Committee. In the cross-examination of Dee Wilson in regard to the meeting of April 26, 1962, he testified, in part, as follows:

"Q Is it not a fact that the County Committee was furnished with the exact language that it was to put in the Minutes of the meeting on this subject?

"A Yes, that's right, but we signed that. We agreed to it.

"Q Didn't the first draft that was furnished to you start out that the Committee has determined?

"A That's right.

"Q And didn't the Committee object to that language and insist on changing it by inserting this phrase, 'At the direction of the administrator'?

"A That's right.

"Q For what reason was that done?

"A It did not originate with us through findings or findings that were in process at that time by the Department of Agriculture.

"Q Isn't it a fact that you did not agree with the conclusion that had been reached?

"A We did not agree with the wording of that resolution placing the responsibility for that upon the County Committee since were—we were directed to do it."

It is the contention of the Government that if what occurred was an administrative cancellation of the allotments in question by the Secretary of Agriculture acting by the State Administrator, such action was lawful and proper under the applicable statutes and regulations, and especially so since the transfers were obtained by fraud. In connection with the matter of fraud, the Government cites a statement in the case of Pan American Co. v. United States, supra (p. 509 of 273 U.S., p. 425 of 47 S.Ct.), to the effect

that the Government occupies a special position in relation to frauds which threaten the integrity of governmental policies. This Court does not deem it necessary to pass upon the question of the authority of the Secretary of Agriculture, or the State Administrator acting for him, to administratively cancel the allotments in question. It seems clear that the State Administrator did not purport to himself make the cancellations but was seeking to have the cancellations made by and through the Culberson County Committee and that they were made by that Committee. On April 27, 1962, the day after the meeting in question of the Culberson County Committee, that Committee executed formal cancellations in the name of the Committee and issued notices thereof in the name of the Committee. On May 2, 1962, timely appeals from such notices requesting review thereof by a review committee were filed. On April 27, 1962, the day after the meeting referred to, the Culberson County Committee, in the name of the Committee, issued notices of the impositions of penalties. Such notices were withdrawn and similar notices were issued on June 1, 1962. On July 4, 1962, a hearing as to the correct amount of the penalties was had before the Culberson County Committee, at which hearing the Chandlers appeared and presented evidence. On July 16, 1962, the last of the penalty notices were issued. On June 12, 1962, and July 25, 1962, timely appeals from the penalty notices requesting review thereof by a review committee were filed. The plaintiffs in their appeals to the Review Committee appealed from the notices of cancellations and notices of the penalties issued by the Culberson County Committee. In the proceedings in this Court the plaintiffs raise the following issue. That issue, as stated in their brief, is as follows:

"Was the action of the Administrator, ASCS, directing the Culberson County ASCS Committee to cancel the allotments * * * and the action of the Culberson County ASCS Committee in taking such action at the direction of the Administrator, a valid exercise of administrative authority?"

It is the view and holding of the Court that what occurred at the county level in this case was not the claimed exercise of administrative authority as to the cancellations but the exercise of interpositional influence at that level.

 The members of the Culberson County Committee were not subordinates of the State Administrator who were required to follow the directive of that Administrator in connection with the allotments. The members of county committees are members of a board created by an Act of Congress. They are elected by the eligible producers acting through county conventions. While members of a county committee are removable for cause, yet any vacancies occasioned by removal are filled by the eligible producers acting through county conventions. In one case, at least, the members of a county committee have defied the directive of a State Committee. See Schuetzle v. Duba (D.C.1962), 201 F. Supp. 754; same case on appeal, Duba v. Schuetzle (8th Cir. 1962), 303 F.2d 570. Section 7.20 of the Regulations provides, in part, as follows:

"The county committee, subject to the general direction and supervision of the State committee, and acting through community committeemen and other personnel, shall be generally responsible for carrying out in the county the agricultural conservation program, the price support programs as assigned, the acreage allotment and marketing quota programs * * *."

In the present case the Department of Agriculture had made an investigation which had given the State Administrator reasonable grounds for believing that the transfer of the allotments in question had been procured by fraud practiced on the Culberson County Committee. Therefore, it was manifestly his duty and responsibility to bring the matter of the cancellation of those allotments before

the Culberson County Committee for its consideration. However, it was manifestly improper for him to issue the directive in question to it. It is the view of the Court that the directive given by the State Administrator constituted an improper interposition on his part. In the case of Accardi v. Shaughnessy, supra, the Attorney General was held to have improperly interposed himself into the administrative proceedings. In the case of John A. Johnson Contracting Corp. v. United States, supra, the contracting officer's commanding officer and the attorneys for the Government were held to have improperly interposed themselves into the procedure provided by the contract.

In each of these cases the basis of the nullification of the procedure was that the plaintiff had never been afforded a hearing free from the effect of improper administrative influence. In the case of John A. Johnson Contracting Corp. v. United States, supra, there was a review of the contracting officer's decision by the War Department Board of Contract Appeals. There was no evidence of any improper influence as to the members of that Board. However, the Court of Claims, in reviewing the case, was of the view that, nevertheless, the plaintiff had been prejudiced by the wrongful interposition at the contracting officer level since such interposition was not made known to the War Department Board of Contract Appeals and that Board may have given weight to the decision of the contracting officer. The improper interposition by the Government into administrative proceedings relating to farm allotments has occurred in other cases.

In the case of Crolley v. Tatton (5th Cir. 1957), 249 F.2d 908, there was involved a denial of a cotton acreage allotment. In the hearing before the Review Committee in that case agents of the Department of Agriculture intruded into the domain of that Committee by meeting with the members of the Committee and discussing aspects of the case with them in the absence of the applicant or his attorneys. The Court held that such intrusion was improper and remanded the proceedings to the Board of Review with directions that it make its independent determination in accordance with lawful administrative procedure.

In the case of Fulford v. Forman (5th Cir. 1957), 245 F.2d 145, the Court discussed the relationship between the County Committees and Review Committees in connection with farm allotments. It then stated (245 F.2d p. 151):

" * * * But since the standards to be followed are invariably general, and many are so flexible that they would open up avenues for discrimination whether intentional, inadvertent, corrupt, or accidental, there was need for another agency, the County Review Committee, having local roots and hence local responsibility for the review of such actions. * * * "

In the case of Graham v. Lawrimore (4th Cir. 1961), 287 F.2d 207, the County Committee determined that Graham, a tobacco farmer, had filed false acreage reports in connection with his tobacco allotments and reduced his tobacco allotments and assessed penalties. Graham filed an application for a review by a Review Committee. That Committee upheld the action of the County Committee. Graham then brought the matter up for judicial review. In that review he asserted that there were such irregularities in the proceedings of the County Committee as to deny him a fair hearing. The District Court affirmed the action of the Review Committee. On appeal that holding was affirmed. The United States Court of Appeals for the Fourth Circuit stated (287 F.2d pp. 208, 209):

" * * * While the proceedings before the County Committee constituted the initial step in the allotment reduction, any alleged irregularities at that level were cured by the hearing de novo before the Review Committee. The Review Committee affirmed the action of the County Committee only after it had

conducted its hearings and made its findings in compliance with the appropriate regulations. Whether or not the County Committee failed to comply with the provisions of the Tobacco Marketing Committee Handbook, or was required to do so, is academic in our view since appellant was given an ample opportunity to present his case under the review procedure."

In the case of Crolley v. Tatton, supra, the interposition of the Government into the cotton allotment proceedings was made at an adjudicatory level. In the present case it was made at the county administrative level. It was heretofore noted that in all of the cases referred to in which the procedure was nullified the basis of the nullification in each case was that at no time had the plaintiff been afforded a hearing free from the effect of improper interpositional influence. Such was not the situation in the present case. The fact of the interposition of the State Administrator at the county level was fully explored at the hearing before the Review Committee and hence the Review Committee knew that the action of the County Committee had been induced by the State Administrator. In the opening statement of counsel for the Government to the Review Committee, it was stated to that Committee in reference to the directive of the State Administrator:

" * * * they [the members of the County Committee] were told that investigation had been made and determined that this was the thing to do * * * they didn't have to do it, but they did do it, and so, if there was any error about that * * * the law provides that they would be back before the review Committee and we start from scratch. I want to make that clear. We start now and for the first time everybody gets to put all of his evidence and you gentlemen have the full authority to make the decision * * *."

It was the duty of the Review Committee to hear the matter de novo and it seems clear from the record that it did do so. There is no claim or even suggestion that any improper influence was exercised or attempted to be exercised on the members of the Review Committee. All of the parties were given an opportunity to present any evidence they deemed pertinent. No hearsay evidence or other objectionable evidence was presented. The record discloses that the findings, conclusions and determination of the Review Committee were based solely upon the evidence presented to the Committee. The record discloses no statements or other action on the part of the members of the Committee which indicated prejudgment or lack of impartiality on their part. The plaintiffs do not make any claim that the majority members of the Committee were lacking in fairness and impartiality. The Government does not claim that the dissenting member of the Committee was lacking in fairness or impartiality. The record indicates that the hearing was conducted in a manner that reflects credit upon administrative procedure. It is the view of the Court that under the doctrine of Graham v. Lawrimore, supra, the interpositional influence irregularity occurring at the county level was cured by the hearing de novo by the Review Committee.

It is the holding of the Court that the review made by the Review Committee was a valid review and that the determination made by it was a valid determination.

There are certain other matters to be considered. After the appeals to the Review Committee had been taken but before those appeals had been heard by that Committee, the plaintiffs on August 22, 1962, commenced the first of their two actions. In that action they sought relief under the Declaratory Judgments Act. Sections 2201 et seq., Title 28, U.S.C.A. They also sought relief under the Administrative Procedure Act. Sections 1001 et seq., Title 5, U.S.C.A. On October 17, 1962, after the findings and determination of the Review Committee

had been entered, the plaintiffs commenced the second action. In that action, in addition to asking for a review of the findings and determination of the Review Committee, they also sought relief under both of the Acts referred to.

Section 1009(c) of the Administrative Procedure Act provides, in part:

"(c) Every agency action made reviewable by statute and every final agency action for which there is no other adequate remedy in any court shall be subject to judicial review. * * *"

The claim of the plaintiffs for relief under the Administrative Procedure Act is based, in part, upon the premise that the allotments in question had been administratively cancelled by the State Administrator and, such being the case, they were not validly reviewable by the Review Committee. In that connection the plaintiffs assert that the cancellations allegedly made by the State Administrator were capricious and arbitrary and not supported by substantial evidence within the purview of Section 1009 of the Administrative Procedure Act. Section 1367, Title 7, U.S.C.A., relating to the judicial review of Review Committee proceedings, provides, in part:

" * * * Notwithstanding any other provision of law, the jurisdiction conferred by said sections [Sections 1361–1368] to review the legal validity of a determination made by a review committee pursuant to said sections shall be exclusive. No court of the United States or of any State shall have jurisdiction to pass upon the legal validity of any such determination except in a proceeding under said sections."

■ The holding of this Court that a valid determination had been made by the Review Committee precludes the granting of relief under the Administrative Procedure Act. As heretofore noted, that Act by its terms precludes relief thereunder where an adequate remedy is available. In this case an adequate remedy was available and was made use of.

It is the holding of this Court that the plaintiffs are not entitled to relief under the Administrative Procedure Act.

■■ It has been authoritatively held that where a party is aggrieved by federal administrative action and there is no administrative or statutory review provided for the review of such action a declaratory judgment action will lie. United Public Workers v. Mitchell (1947), 330 U.S. 75, 93, 67 S.Ct. 556, 91 L.Ed. 754. See, also, Rusk v. Cort (1962), 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809; Lavery, The Declaratory Judgment In Administrative Law, 14 F.R.D. 479 (1954); American President Lines v. Mackey (D.C.1953), 120 F.Supp. 897. The granting of declaratory relief is not necessarily to be denied because of the pendency of another action or the availability of another remedy where such action or remedy would not be determinative of the controversy between the parties. Maryland Casualty Co. v. Consumers Finance Service (3d Cir. 1938), 101 F.2d 514, 515. There are two principal criteria made use of by the courts in connection with the matter of granting a declaratory judgment. One is whether the judgment will serve a useful, practical purpose and the other is whether it will terminate and afford relief from uncertainty and insecurity. Panhandle Eastern Pipe Line Co. v. Michigan Consol. Gas Co. (6th Cir. 1949), 177 F.2d 942, 944; Aetna Casualty & Surety Co. v. Quarles (4th Cir. 1937), 92 F.2d 321, 325.

■ In the present case the plaintiffs commenced their first action on August 22, 1962. At that time their appeals to the Review Committee had not been set for hearing. It appears that the plaintiffs were fearsome that there might be quite a lapse of time before the appeals would be heard. It further appears that at the time the plaintiffs were uncertain as to what they might or might not do in connection with their transactions and their cotton production activities. Be-

cause of the features referred to, the plaintiffs sought a declaration as to their rights. However, before their application for declaratory relief could be heard on its merits the Review Committee convened and heard and determined the question of the cancellations on the merits. That determination has now been reviewed by this Court and held to be a valid determination, and based on that holding a coercive judgment will be entered. It seems clear that no useful purpose would be served by the entering of a declaratory judgment.

It is the holding of the Court that the application of the plaintiffs for a declaratory judgment be denied.

It was heretofore noted that in March, 1962, the Chandlers had all of the cotton allotments involved in their operations reconstituted under one ASCS farm number. Thereafter they planted cotton on the tracts here in dispute. On August 17, 1962, the Culberson County Committee issued a Notice of Acreage as to the 1962 crop on the reconstituted farm. The Notice informed the Chandlers that all cotton produced on the disputed acreage portion of the reconstituted farm was in excess of the allotment for the reconstituted farm and that unless such excess was destroyed by September 3, 1962, such excess cotton would be penalized and that all cotton produced on the reconstituted farm would be ineligible for price support loans. On August 30, 1962, the Chandlers filed notice of appeal to the Review Committee from the Notice of Acreage of August 17, 1962. The record does not disclose that such appeal has been heard by the Review Committee. The question as to the validity of the cancellation of the allotments has been passed on by this Court herein. Any other questions which may be raised by the appeal from the Notice of Acreage are not before this Court for consideration.

The plaintiffs on October 17, 1962, as heretofore noted, made application for and secured the issuance of a preliminary injunction. The application, in substance, was based upon the claimed invalidity of the allotment cancellations. It being the holding of the Court that the cancellations were not invalid, the injunction will be dissolved.

It Is Hereby Ordered that judgment shall be entered (1) affirming the determination of the Review Committee; (2) denying the plaintiffs relief under the Administrative Procedure Act; (3) denying the request of the plaintiffs for a declaratory judgment; (4) dissolving the preliminary injunction heretofore issued.